**SAFEWAY STORES, INC., Appellant,**

**v.**

**DISTRICT OF COLUMBIA, Appellee.**

**Nos. 84–1639, 85–675 to 85–678 and 85–1024 to 85–1026.**

District of Columbia Court of Appeals.

Argued April 17, 1986.
Decided May 1, 1987.

Ralph N. Albright, Jr., with whom Glenn P. Sugameli, Washington, D.C., was on the brief, for appellant.

Edward E. Schwab, Asst. Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before NEWMAN, FERREN, and BELSON, Associate Judges.

FERREN, Associate Judge:

Safeway Stores, Inc. challenges the assessments of eight properties for the 1983 tax year. Safeway maintains, first, that the trial court erred in sustaining these assessments because the assessors failed to take into account all the factors mandated by D.C. Code § 47–820(a) (1981)—in particular, the income earning potential of the improvements on the properties. Safeway contends, second, that the trial court erred in upholding the assessed values of the land parcels. Finally, Safeway argues that the trial court's order is legally insufficient because it does not make necessary findings on the District's method of valuing the land portions of the properties. We affirm as to Tax Docket Nos. 3221–83, 3222–83, 3223–83, 3224–83, 3225–83, 3226–83, and 3227–83. We reverse as to No. 3228–83, because we agree with Safeway that the assessor did not adequately consider this property's income earning potential in arriving at the final valuation.

I.

Safeway owns three of the eight stores: Tax Docket Nos. 3222–83, 3224–83 and 3227–83. It previously owned the remaining five, Tax Docket Nos. 3221–83, 3223–83, 3225–83, 3226–83, and 3228–83, but sold the properties and now leases them back under long-term leases that obligate Safeway to maintain the stores and to pay the real estate taxes and insurance.[1]

The District's assessors used the same approaches to value all eight stores. They valued the land with the comparable sales approach; i.e., they compared recent sales of properties similar to the Safeway property. To value the improvements, the assessors used the replacement cost less depreciation approach; i.e., they determined the cost of replacing the improvements less depreciation attributable to age, condition, or other factors.

After a three day trial,[2] the trial court sustained the assessments in five of the cases but ordered reduced assessments in the other three because the Department of Finance and Revenue had failed properly to account for split zoning in valuing the land (part of each property was zoned commercial and part was zoned residential). The District has not appealed the reductions of these assessments. Safeway, however, objects to the improvements valuations be-

---

**1.** The locations of the eight stores are:
No. 3221–83—610 H Street, N.E.
No. 3222–83—1825 Michigan Avenue, N.W.
No. 3223–83—522 7th Street, S.E.
No. 3224–83—4685 MacArthur Blvd., N.W.
No. 3225–83—228 7th Street, S.E.
No. 3226–83—1747 Columbia Road, N.W.
No. 3227–83—3830 Georgia Avenue, N.W.
No. 3228–83—645 Milwaukee Place, S.E.

**2.** A taxpayer dissatisfied with the assessors's valuation may appeal to the Board of Equalization and Review. D.C. Code § 47–825(i) (1981). The Board is statutorily required to "attempt to assure that all real property is assessed at estimated market value." Id. § 47–825(f). The taxpayer may obtain further review, as in this case, by filing a petition with the Tax Division of the Superior Court after payment of the disputed tax. Id. §§ 47–825(i), –3303. The Tax Division may "affirm, cancel, reduce, or increase the assessment." Id. § 47–3303. We review the tax division decisions "in the same manner as other decisions of the court in civil cases tried without a jury." Id. § 47–3304(a). We can affirm, modify, or reverse with or without remand. Id.

cause the assessors failed to incorporate the income earning potential of the structures, and to the land valuations because they failed to include necessary adjustments to the values based on comparable sales of smaller properties.

## II.

### A.

According to D.C. Code § 47–820(a) (1981), "[t]he assessed value for all real property shall be the estimated market value of such property as of January 1st of the year preceding the tax year, as determined by the Mayor." "[E]stimated market value" is the price a willing buyer would pay a willing seller for the property in an arms-length transaction.[3] In determining estimated market value,

> the Mayor shall take into account any factor which might have a bearing on the market value of the real property including, but not lim[i]ted to, sales information on similar types of real property, mortgage, or other financial considerations, reproduction cost less accrued depreciation because of age, condition, and other factors, income earning potential (if any), zoning, and government restrictions.

*Id.* Safeway claims the word "shall" in the statute creates a mandatory duty. *See JBG Properties, Inc. v. District of Columbia Office of Human Rights*, 364 A.2d 1183, 1185 (D.C.1976) ("The word 'shall' in a statute, of course, generally creates a mandatory duty."). Thus, Safeway argues, the assessors had to consider "income earning potential," one of the factors listed in § 47–820(a). According to Safeway, the assessors failed to take income earning potential into account and therefore violated the statute.

We agree with Safeway that the statute plainly requires the Mayor to consider a property's income earning potential, as well as the other listed factors. The regulations promulgated under the statute, however, give the Director of Finance and Revenue discretion in choosing the method or approach for an assessor to use in estimating the market value of a particular property. Under the regulations, the Director, and thus the assessor, may apply *"one or more* of the generally recognized approaches to valuation set forth in this section or any other method the Director deems necessary to arrive at estimated market values." 9 DCMR § 307.2 (1986) (emphasis added). The "generally recognized" approaches are precisely the factors mandated by the statute: the "comparable sales approach," the "replacement cost approach," and the "income approach." *Id.* §§ 307.3, 307.4 & 307.5.

■ Safeway appears to argue, without regard to the discretion allowed by the regulations, that an assessor cannot lawfully choose one of the three approaches but must incorporate all three into the final calculation. In *District of Columbia v. Washington Sheraton Corp.*, 499 A.2d 109, 113 (D.C.1985), however, we noted that "[u]sually the appraiser considers the use of all three approaches, but [that] one method may be most appropriate depending on the individual circumstances of the subject property." Thus, we read the statutory requirement that appraisers "take into account" evidence relating to each approach to mean they may ultimately rely on only one of the three, as long as they consider them all and reject the other two for legitimate reasons. In carrying out this responsibility, the District assessors need not work through all three methods to completion before choosing one, but they must consider all three and have a reasoned basis for picking one over the other two.

**3.** D.C. Code § 47–802(4) (1981) defines "estimated market value" as:

> 100 per centum of the most probable price at which a particular piece of real property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would be expected to transfer under

prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other.

The trial court ruled that the assessors' decisions not to use the income approach to valuation were not "unreasonable or arbitrary." The court determined that the assessors had considered the future income method proposed by Safeway, reasonably rejected Safeway's methodology as impractical or inaccurate, and justifiably concluded, under the circumstances, that no other means of calculating future income would give a good measure of market value. We therefore must review the trial court's ruling by examining the assessors' testimony to determine whether each of them, before selecting the replacement cost less depreciation method, (1) considered information relating to the "income earning potential" of the properties, and, (2) based on this information, reasonably rejected expected future income as a reliable means of calculating fair market value.

### B.

Rodney Dobozy assessed three of the properties, Nos. 3221–83, 3223–83, and 3225–83, all occupied by Safeway under sale and leaseback arrangements. His testimony makes clear that he examined income and expense information for each property but rejected the income approach because (1) he could not accurately determine the properties' future income, and (2) the statutory goal of equalizing valuations was better served by the replacement cost approach. In particular, the current and recent income from the properties consisted solely of the rent paid by Safeway. Dobozy believed this income did not reflect the properties' fair market value, partly because the actual income figures appeared not to reflect his view of the market value based on other evidence, and partly because of the very nature of a sale and leaseback arrangement. Although he never articulated precisely why, Dobozy believed one cannot generally trust sale and leaseback contracts to reflect the market rental value of a property; indeed, when he concluded that the leases were an inadequate measure of value, he had never seen the actual leases themselves (although he had seen recent income and expense records). Finally, Dobozy testified that he did not attempt to calculate a fair market rent using rental rates from other, comparable properties because "there wasn't anything else comparable [to the Safeway properties] in the area."

Robert Weaver assessed No. 3222–83, a property Safeway owns but leases out. He considered and rejected the income approach for two reasons: the only income generated under the current lease was the lessee's obligation to pay the taxes (an income he thought insufficient to support the property), and the property was "more or less a special purpose property," *i.e.*, property like a grocery store or fast-food restaurant for which Weaver usually uses the replacement cost approach. Like Dobozy, he also stated that he could not find comparable rental figures from other properties.

Quinton Harvell assessed No. 3224–83, another store owned by Safeway. Although he had past income and expense statements for the property, they indicated no income because the building was unoccupied at the time. He therefore could not use past or current income to determine future earnings. Harvell also stated that the property is a unique, special purpose property of a sort that "very rarely change[s] hands." He noted that an income approach to assessing owner-occupied property would not be feasible without income and expense information from similar buildings, which he apparently lacked.

George S. Toll, Jr. assessed property No. 3226–83, sold and leased back by Safeway, and No. 3227–83, which Safeway owns. When asked whether he had income and expense statements for either of these properties, he replied, "I don't recall. . . . I know that Safeway is very good about submitting them. If there was one I am sure I know I had it." Toll explained that he did not use the income approach because he had found no comparable sale or rental properties from which to derive a market income, and because the replacement cost approach is appropriate where there is limited rental and market data. With respect to No. 3226–83, Toll said he had not seen or considered the lease under which Safeway

occupied the property because he considered the replacement cost approach more appropriate where no comparable rents could be found to determine that a given rent reflected a market rate.

 As the trial court correctly noted, a taxpayer bears the burden of proving that an assessment is incorrect or illegal, not merely that alternative methods exist giving a different result. Super.Ct.Tax R. 11(d); *Automatic Enterprises, Inc. v. District of Columbia*, 465 A.2d 388, 391 (D.C. 1983); *Wyner v. District of Columbia*, 411 A.2d 59, 60 (D.C.1980). Safeway may be correct that income capitalization is generally the best method for valuing income-producing business property, "because it is most similar to the analysis made by knowledgeable buyers before they purchase" such a property. *Washington Sheraton*, 499 A.2d at 113; *accord, Great Atlantic & Pacific Tea Co. v. Kiernan*, 42 N.Y.2d 236, 240, 397 N.Y.S.2d 718, 721, 366 N.E.2d 808, 811 (1977). Here, however, Safeway has not shown that the reasons given for rejecting the income approach were irrational or unfounded.

All four assessors clearly considered the income approach for these properties and had reasons for choosing the replacement cost method instead. The trial court held reasonable and lawful the assessors' reasons for rejecting the income approach: first, the existing leaseback arrangements were not trustworthy measures of market rental value and, second, the effort to calculate rental value by reference to other properties would, given the unusual character of the Safeway improvements, prove sufficiently burdensome to justify use of alternative approaches. We agree. That one assessor, Toll, did not actually view prior income and expense statements is irrelevant, since he consciously and reasonably rejected the income approach for reasons independent of the actual income from the particular property he assessed. Similarly, the fact that Dobozy chose not to use the income method without having examined the particular leaseback contract does not necessarily imply a violation of law. Preferably, the assessors could have

been more thorough, examining the actual income and detailed lease arrangements for each property. But Safeway has not challenged the assessors' premise that each lease was the product of a sale and leaseback transaction; nor has Safeway argued that the actual rent on the leased properties was an appropriate basis for an income analysis. Rather, Safeway argues that the District should have conducted an income analysis based on comparable rents for other properties. We cannot tell from the record that the assessors used good judgment in deciding that comparable rental properties were not available; but Safeway did not persuade the trial court, and has not demonstrated from the record on appeal, that in each case comparable properties existed and were ignored.

Safeway argues, nonetheless, that the trial court improperly permitted the District assessors to ignore the impact of inexpensive, long-term leases that effectively are encumbrances on the properties, reducing their resale market value. In advancing this argument, Safeway apparently believes a proper income analysis would have calculated a rental income figure based on comparable properties with lease incomes at fair market rates, and then discounted that income figure because Safeway's leaseback arrangement gave Safeway a cheap, below market rental that deprived the property owners of full market value for some time into the future. Safeway, therefore, asks this court to reduce its tax obligations because Safeway was in a position to negotiate leasebacks at low rates. We are unmoved.

If the current leases encumber the property, Safeway can hardly complain, for Safeway itself negotiated these leases. Moreover, Safeway's very argument gives us confidence in sustaining the trial court's approval of the assessors' decisions to reject the leases as measures of property value. That argument confirms Safeway entered into the kind of inexpensive leaseback arrangement which, if permitted to determine the market value of the property, would allow owners to create artificial sale and leaseback arrangements solely to reduce their property tax obligations to the

community.[4] Because of that possibility, we believe the Department of Finance and Revenue would be justified in adopting at least a presumption against recognizing such "encumbrances" in valuing leaseback property (especially where the lessee also pays the property tax). In approving this kind of presumption, of course, we need not assume Safeway itself entered into these sale and leaseback arrangements in the hope of reducing property taxes.

Finally, Safeway argues that the trial court wrongly concluded the assessors' testimony showed that the properties were "special purpose" in character, buttressing their decisions not to use either the comparable sales or the income approaches. As the court pointed out, however, Dobozy, Weaver, and Harvell each indicated, with varying degrees of clarity, that the properties were unusual in character, hampering any calculation of future income. Safeway entirely failed to challenge this testimony. In fact, Safeway's counsel maintained in closing argument that the properties *were* special purpose, although he drew a different conclusion from that fact. We conclude, therefore, that the trial court's analysis of the "special purpose" evidence has substantial support in the record and further justifies its approval of the replacement cost approach in assessing these properties.

### C.

■ Galen L. Myers assessed property No. 3228–83 using the cost less depreciation method. He stated at trial that he had not examined income and expense statements and that he was "not really sure, offhand" whether Safeway had submitted the information. When asked why he had chosen the cost approach rather than the income method, he replied "[b]ecause there is an office policy to use the cost approach...." Under questioning from the court, Myers clearly repeated this explanation for his decision.

The court later stated in its memorandum opinion that "Myers reviewed income and expense statements" for the property. This factual finding is "clearly erroneous." *Rock Creek Plaza-Woodner Ltd. Partnership v. District of Columbia*, 466 A.2d 857, 859 (D.C.1983). The court also noted that Myers understood there was an "office policy" to use the cost approach in valuing grocery stores and similar properties, but the court credited Myers' "testimony indicating that he could depart from that practice and use income analysis or [a] method other than the cost approach." We do not believe the record can be read that way. Myers implied he thought the policy might be unfair, but he did not say he could depart from the practice of using the cost approach for Safeway stores.

As we elaborate below in Subpart D., an absolute Department rule against using the income approach for assessing certain properties would violate the statutory injunction that assessors "take into account" expected future income for each property assessed. Judging from his testimony, therefore, Myers did not properly exercise his discretion in rejecting the income approach, because he did not even consider the merits of that approach. He therefore did not fulfill his obligation under § 47–820(a) to consider income earning potential. *See Johnson v. United States*, 398 A.2d 354, 361 (D.C.1979) ("Discretion signifies choice.... [T]he decisionmaker exercising discretion has the ability to choose from a range of permissible conclusions.") (citations omitted). Myers appears to have prematurely narrowed his "range of permissible conclusions." *Id.* Because the trial court's reasons for approving Myers' assessment for No. 3228–83 are not supportable, we conclude this ruling was plainly wrong and set aside that assessment. D.C. Code §§ 17–305(a), 47–3304 (1981).

### D.

Extending the argument clearly applicable to Myers' assessment, Safeway argues

---

**4.** We note that, to accomplish this goal, the sale and leaseback contract may well represent an "arms-length" deal: both sides can benefit from a cheap leaseback as long as the sale price is sufficiently low. There need be no illicit collusion.

that all the assessors failed to consider income earning potential because they relied exclusively on the reproduction cost approach "pursuant to an arbitrary office policy to use that method in valuing Safeway stores and other supermarkets." Myers, however, was the only assessor who testified about such a policy. The others gave explanations indicating that they had actually considered the income approach, rather than rejecting it out of hand because of a Department rule.[5]

The trial court stated, however, that even if the assessors had been acting pursuant to a "relatively inflexible 'office' policy that the cost or sales approach be used, ... [Safeway] may prevail *only* upon establishing that such a preference by assessing authorities is arbitrary, either intrinsically or as applied to the instant cases." (Emphasis added). The trial court is mistaken here. D.C. Code § 47–820(a) (1981) requires that the Mayor or his agent take income earning potential into account during every property valuation. An inflexible rule barring the income method for a particular class of properties would violate this mandate. Although good reasons might typically justify rejecting the earnings approach for a particular class of property, it is always possible that the reasons would turn out not to apply to a particular piece of property in that class. For instance, it is possible that, for a particular Safeway store, comparable rental properties would prove available; an office policy cannot assume away that possibility. Assessors, therefore, must make a judgment as to whether the usual reasons for rejecting the income approach really do apply in a given case. Only in this way can they properly exercise the discretion permitted under the statute and regulations allowing assessors to choose for each property one of the three standard approaches to valuation.

On this record, however, we are not convinced that the Department had an inflexible policy to use the cost method or that all the assessors, not just Myers, followed such a policy. Only Myers testified about the alleged policy. More importantly, the other assessors demonstrated that they made a reasoned decision not to use the income approach and rationally justified their preference for a cost approach. We therefore reverse only the valuation by the one assessor who appears to have rejected the income approach without a reason better than the existence of an office policy; we will not reverse the valuations rationally defended by the other assessors.

## III.

In valuing the land, all assessors used a comparable sales approach, determining the market value of a given parcel of land (regardless of its improvements) by looking at recent sales of similar properties. Safeway claims the assessors should have adjusted their valuations because the Safeway parcels were larger than the comparable sale properties used to assess them. Larger parcels, says Safeway, always have a lower square-foot value than comparable smaller parcels and should be discounted to account for this difference. The District responds that Safeway never specified what adjustments should have been made. Moreover, the District disputes Safeway's factual premise that large commercial parcels or assemblages of lots have a lower per square-foot value than smaller ones.

■ The testimony of the District assessors varied as to whether the large land areas should have higher or lower values per square foot than comparable smaller

---

5. Dobozy testified that he had used the cost approach because "the income of these properties did not really reflect market evidence, and in order for us to be in equalization with other properties like this we ended up—or ended up using that kind of approach." He did use the terms "we" and "us" here, and he also spoke of Safeway stores in general: "the income approach was not applicable because of the typically lease-back arrangements that Safeway engages in." But, the plural terms may have been inadvertent, and, since he assessed three of the Safeway properties, he could naturally speak in more general terms about such properties. Dobozy provided no explicit evidence that he or the other assessors acted under a rule mandating the cost approach; instead, he, like the others, suggested a number of reasons for adopting the method he chose.

parcels.[6] Safeway did not ask the five assessors whether they had adjusted their valuations up or down when comparing them to smaller comparable parcels. Nor did Safeway articulate its complaint in closing argument, which consisted solely of the claim that the assessors had ignored income earning potential together with a plea to accept the valuations prepared by Safeway's expert. Beyond the argument favoring the income approach, Safeway attempted no point-by-point critique of the District's assessments. On this record, therefore, the trial court had no basis to require downward adjustment of land values because of size comparisons with comparable parcels. Safeway simply did not frame and present this question to the trial court in a manner sufficient either to require an explicit decision by the court or to create a record for appeal.

## IV.

■ Safeway, finally, asserts that the trial court failed to make sufficiently detailed findings approving the land valuations, in contrast with its findings on the assessments of improvements.[7] Under the

6. Weaver and Toll testified that the larger land areas should have higher values whereas Harvell maintained that a smaller property will have a higher square-foot value than a larger property.

7. Safeway claims the trial court did not understand that the assessors valued the land separately from the improvements and used the comparable sales approach in determining land values. This claim ignores findings pertaining to three of the properties where the assessor failed to consider split zoning as a factor in adjusting his estimate of value. The court or-

circumstances, we disagree. The trial court decided that the assessments of Nos. 3221–83, 3222–83, and 3226–83 had to be adjusted for split zoning, which clearly manifests attention to land values. The court otherwise made conclusory findings with respect to land values. We are not prepared to require more of the trial court, however, in light of Safeway's own failure to raise and delineate with precision at trial the complaints about the land valuations now advanced on appeal. Basically, Safeway argued for an income capitalization approach that would have included land values; it never argued directly against the comparable sales approach standing alone, so it failed to inform the trial court of the flaws it perceived in the assessor's separate valuations of the land.

*Affirmed in part and reversed in part.*

dered relief for properties in Tax Docket Nos. 3221–83, 3222–83 and 3224–83. In reference to No. 3227–83, the court noted that the assessor had taken split zoning into account in his assessment. These findings related only to the land. Elsewhere, the court also stated: "Both parties conceded that the comparable sales approach was inappropriate for other than land value because of a paucity of comparable building sales." This statement, too, indicates trial court understanding of the difference between land and improvements valuations.