William B. WOLF, Sr., et al., Appellants,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 89–1091.

District of Columbia Court of Appeals.

Argued June 26, 1991.
Decided Oct. 4, 1991.

M. Paul Zimmerman, Washington, D.C., for appellants.

Martin B. White, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Before FERREN, TERRY, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

Appellant Wolf and other general partners of MidCity Investment Company appeal from a decision of the Tax Division of the Superior Court denying their petition for a partial refund of real property taxes for tax year 1986. Appellants own the office building located at 1001 Connecticut Avenue, Northwest, on the corner of K Street (above the Farragut North Metro station). They maintain that the trial court (1) erred in concluding that the District conducted an independent assessment for tax year 1986 when, as appellants see it, the District simply reiterated its proposed 1985 assessment; (2) erred in upholding the District's comparable sales and income valuation methods, since the District's calculations failed to consider the actual leasing and financing arrangements encumbering this and other comparable properties; and

(3) erred in approving the District's initial 1986 tax assessment after the District, at trial, "abandoned" that initial assessment in an attempt to prove the building was worth more. Finding no errors, we affirm.

## I.

The office building at 1001 Connecticut Avenue, N.W., built in the 1950s and never renovated, is located at one of the best commercial sites in the city. In tax year 1985, the District's proposed assessment was $14,620,500, of which $9,149,400 was allocated to land and $5,471,100 was allocated to the building and other improvements. Upon appeal to the Board of Equalization and Review (the Board), the proposed 1985 assessment was reduced to $13,539,022.

For tax year 1986, the parcel was assessed at the same value as it was for 1985: $14,620,500, with $9,149,400 allocated to land and $5,471,100 allocated to building and other improvements. Unlike the previous year, the Board affirmed the proposed 1986 assessment. Appellants paid the tax and filed a timely petition for refund in Superior Court, alleging that the proper assessment should be $10,356,360, the building's assessed value in tax year 1984. Before trial, the District amended its answer to say that the proper valuation of the property, including the building and other improvements, was $17,830,000.[1]

During the two day trial, both Robert L. Klugel, Chief of the Real Property Tax Section of the District of Columbia Department of Finance and Revenue, and Troy Davis, the District's line assessor, testified regarding the methods they used to determine the total value of 1001 Connecticut Avenue.[2] Both witnesses considered two of the three accepted procedures for valuation;[3] the "comparable sales approach," i.e., comparing recent sales of properties

similar to 1001 Connecticut Avenue, see 9 DCMR § 307.3 (1986), and the "income approach," i.e., using statutory guidelines to determine the amount an investor would be willing to pay to receive the future income stream that the property is expected to yield, see id. § 307.5. After calculating the total value of the property, the assessors obtained the estimated value of the building by using the standard "building residual" method under which they subtracted the land value, $9,149,400, from the total value, $14,620,500, to arrive at a figure of $5,671,100 for improvements.

Klugel also testified that for tax year 1986 he directed all line assessors to give considerable weight to the 1985 assessments arrived at for 1985 but to alter them if market data and other considerations warranted a change. He explained that economic conditions in the early 1980s, which included overbuilding and high interest rates, had resulted in an oversupply of office space, making it unlikely that building values would increase between January 1, 1984 (the valuation date for tax year 1985) and January 1, 1985 (the valuation date for tax year 1986). For the 1985 assessments the Board had reduced, Klugel directed assessors to determine the validity of the Board's valuations in light of available data. Where the 1985 Board valuations appeared justified, these were to be used as base figures for 1986 assessments, but where Board figures were unjustified, assessors were to use the Department's originally proposed 1985 figures. In all cases, 1985 valuations were to be modified if available information demonstrated a reason to change the valuation for 1986. Klugel stressed to his assessors that each property "starts off a tax year fresh." Assessors, therefore, were not to see themselves bound by the Board's prior year valuations.

---

1. The District based its increased assessment on new information made available by appellants in connection with this lawsuit. This information was in addition to the new information the assessors had available to them when conducting their independent assessment for tax year 1986.

2. Klugel testified for the District; appellants called Davis as their own witness.

3. The third generally accepted approach to value, the "replacement cost approach," see 9 DCMR § 307.4, was not used because the assessors considered it inappropriate for older buildings.

Appellant Wolf, whose law firm in the building had received a below-market rental rate, testified that the proper 1986 assessed value for the building was the property's tax year 1984 valuation. He argued that the value of the building had not increased between January 1, 1983 and January 1, 1985 because the actual net income from the building had not increased during that period. He explained that the building was in a "time warp" because of "the structure, its age, its amenities, its lack of amenities, and first and foremost, its [below market rate] leases." In addition, he concluded that the net operating income from the property went from $1,136,440 in 1982 to $1,218,512 in 1983 and back down to $1,167,944 in 1984. He did not, however, estimate future "income earning potential," nor did he use the comparable sales method of valuation.

The trial court sustained the Department's assessment for tax year 1986, concluding that the assessment figure represented "a reasonable and conservative estimate of value in view of other sales and upon review of the indicated value obtained by the income capitalization approach." The court was satisfied that the Department had conducted a new assessment for 1986 because the assessor had made an independent analysis that took into consideration new information not available in the prior year. The court concluded that, overall "the assessors applied the generally recognized approaches to value in making the assessment for tax year 1986. The resulting assessment appears to be justified from the evidence. Therefore, the decision of the Board of Equalization and

Review should be affirmed" (citation omitted).

The trial court also found appellants' proposed valuation "flawed factually and legally" primarily because their income approach to value was based on "a snapshot of a single year's income and expenses" and because they had made no effort to take into account longer term income potential or comparable sales.

## II.

Appellants argue that the trial court erred in concluding that the District conducted a genuine reappraisal of their property for tax year 1986 because, they maintain, the District simply reiterated its own tax year 1985 assessment despite the Board's reduction of that 1985 assessment. They rely on *District of Columbia v. Burlington Apartment House Co.*, 375 A.2d 1052 (D.C.1977) (en banc), in which we held that "an equalized assessment from the Board ... becomes the basis for taxation until a subsequent reassessment has been made according to law." *Id.* at 1056. In *Burlington Apartment House,* we refused to validate an assessment that "was exactly the same as that which had been set for the previous fiscal year by the Board," because "it is clear that the [new] figure was not based upon a reassessment utilizing updated sources of information, but rather was simply a routine repetition of the [previous year's] assessment." *Id.* at 1056 n. 8.

■ Assessments are not necessarily invalid because they are the same as in the previous year.[4] *See Brisker v. District of*

---

**4.** Assessments may be the same from one year to the next in part because we recognize that the assessment process is a complex approximation, far from an exact science, requiring assessors to apply their best judgment to a number of indeterminate factors to calculate a single market value figure. As the American Institute of Real Estate Appraisers has noted:

When the purpose is to estimate market value, the appraiser researches market perceptions, opinions, and attitudes, particularly as they are revealed in recent sales, leases, or other types of direct market transactions. An appraiser attempts to gather all available data that may be pertinent to the assignment, to

organize them, and to perform a preliminary analysis of them before applying any of the three [valuation] approaches.... The process of extracting relevant data from the vast array of available market data helps an appraiser to develop a perception of the market. The perception is essential in applying appraisal judgment throughout the valuation process and in the final reconciliation of value indications.

 \* \* \* \* \* \*

Reconciliation is the step in the valuation process in which an appraiser analyzes alternative conclusions and selects a final value estimate from among two or more indications of value....

*Columbia,* 510 A.2d 1037, 1040 (D.C.1986). Nor are they invalid because, in the course of reassessing, the assessor looked at the prior assessment. *See id.* In this case, the trial court specifically found as a matter of fact that the reassessment relied on updated sources of information:

> The taxpayer attempted to show that no assessment was made for the property for tax year 1986 because the same assessment for 1985, which had been rejected by the Board of Equalization and Review, was repeated. Although the assessment for both years was the same, the evidence shows that the property was assessed again in tax year 1986. The fact that the new assessor relied in part upon information developed by the prior assessor does not alter the validity of the assessment. He made an independent analysis, conferred with his superior, and concurred in the results. Further, additional information was taken into consideration when the assessment was made for tax year 1986.

>> Reconciliation is the part of the valuation process in which the appraiser most directly draws upon his or her experience, expertise, and professional judgment to resolve differences among the value indications derived from the application of approaches. The appraiser weighs the relative significance, applicability, and defensibility of each value indication and relies most heavily on the one that is most appropriate to the purpose of the appraisal. The conclusion drawn in the reconciliation is based on the appropriateness, the accuracy, and the quantity of the evidence in the entire appraisal.

> AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS, THE APPRAISAL OF REAL ESTATE 272, 504–05 (8th ed. 1983).

5. Appellants rely on a Superior Court opinion, *District of Columbia Redevelopment Land Agency v. District of Columbia,* 106 Daily Wash. L.Rptr. 2257 (D.C.Super.Ct., Dec. 15, 1978), in which petitioners alleged the District had failed to reassess their property and moved for summary judgment claiming that their assessed value must remain the same as that assessed for the previous year. After petitioners filed a stipulation of facts asserting that the notice of assessment contained a "routine repetition" of the previous year's assessment and that no reassessment had been made "utilizing updated sources of information," *id.* at 2264, the District filed assessors' affidavits which simply noted that the assessors had "reviewed the best information

Wagner, J., Findings of Fact, Conclusions of Law and Order Affirming Assessment at 11 (Aug. 18, 1989) (Order).

Our review of Tax Division appeals is the same as it is for other civil cases tried without a jury. *See* D.C.Code § 47–3304(a) (1990). "The trial court's factual findings are binding upon this court 'unless they are clearly erroneous; if the findings are acceptable, we will not disturb the court's judgment unless it is plainly wrong or without evidence to support it.'" *George Washington Univ. v. District of Columbia,* 563 A.2d 759, 761 (D.C.1989) (quoting *Rock Creek Plaza–Woodner Ltd. Partnership v. District of Columbia,* 466 A.2d 857, 859 (D.C.1983)); *see* D.C.Code § 17–305(a) (1989).

■ Appellants argue that the testimony at trial clearly shows that the 1986 assessment was merely a routine reiteration of the original 1985 assessment and that assessor Davis felt compelled merely to repeat the 1985 assessment made by Klugel, his superior.[5] The trial court, however, found otherwise:

made available" and had considered the previous years' assessments and Board of Equalization and Review files. The assessors did not assert they had made a new assessment. The Superior Court, applying the *Burlington Apartment House* rule requiring genuine reappraisals, *see* 375 A.2d at 1056, found that the assessors' "affidavits contain no affirmative representations that *new* assessments were made [in the second year]; in fact, they make it clear that the contrary is true. Each assessor has stated that he saw no reason to *change* his prior assessment and that he assigned the *same* value for [the second year]. It would have been quite easy for the assessor to set forth the basis for the *new* assessment if one had actually been made.... [T]he assessors have stated that they merely carried over the valuation determined by them [in the first year]." *Redevelopment Land Agency,* 106 Daily Wash.L.Rptr. at 2264 (emphasis in original). The court, therefore, concluded that *the case presented no genuine issues of material facts* and granted summary judgment.

Unlike the trial court in *Redevelopment Land Agency,* however, the court in this case, finding that the factual issue of reassessment was contested, held a full trial and credited the assessors' testimony that they had considered new evidence from the owners' income and expense statements that had been unavailable for tax year 1985, as well as new information about income streams from other office buildings in the city. The court concluded that a genuine

5.... After going over the data with Mr. Klugel, [Mr. Davis] agreed with the figure indicated by the Chief of Standards and Review. Mr. Davis had also examined the income for the subject property for at least two years and market data for other income producing properties in the city. Mr. Davis and Mr. Klugel also reviewed equalization charts....

\* \* \* \* \* \*

7.... In this case the line assessor concurred with the conclusions reached by Mr. Klugel after reviewing all the available data....

8.... For tax year 1986, [Mr. Klugel] also had the owners' income and expense statement for 1983, as well as the information about income streams for other office buildings in the city. He also had leasing information for the subject property. Based upon the information, he felt the change from the Board's results in the prior year was justified as did Mr. Davis.

Order at 4–6. We cannot say that the court's decision to credit the testimony of the assessors was "plainly wrong or without evidence to support it." D.C.Code § 17–305(a). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Mr. Davis testified that he made use of some figures from 1985 but that he had independently evaluated them with attention to "arriving at the best equalization among office buildings;" he also conducted an independent comparable sales analysis. In addition, assessor Davis flatly denied appellant Wolf's charge that Klugel had told him to repeat the prior year's assessment. Klugel testified, moreover, that he had evaluated new data on income streams that had not been available to him in 1985. Under these circumstances, we cannot say the trial court's

reassessment had been made. It is these factual findings and conclusions of the trial court that

judgment was unsupported by the evidence.

### III.

We turn to appellant's challenge to the District's valuation methods. "The assessed value of property for real property taxation purposes shall be the 'estimated market value' of the property on January 1st of the year preceding the tax year." *District of Columbia v. Washington Sheraton Corp.,* 499 A.2d 109, 112 (D.C.1985) (citing D.C.Code § 47–820(a) (1981)). The D.C.Code defines "estimated market value" as:

100 per centum of the most probable price at which a particular piece of real property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would be expected to transfer under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other.

D.C.Code § 47–802(4) (1990). In determining the "estimated market value," the assessor must "take into account any factor which might have a bearing on the market value of the real property...." *Id.* § 47–820(a). The regulations promulgated under the statute "give the Director of Finance and Revenue discretion in choosing the method or approach for an assessor to use in estimating the market value of a particular property." *Safeway Stores, Inc. v. District of Columbia,* 525 A.2d 207, 209 (D.C.1987); *see* 9 DCMR § 307.2 (1986) (Director may apply "one or more of the generally recognized approaches to valuation set forth in this section or any other method the Director deems necessary to arrive at estimated market values"). Appellants argue the District incorrectly applied two of the "generally recognized" approaches to valuation: the "income" and "comparable sales" methods.

are at issue here.

### A.

■ The "income" approach to valuation "bases assessed value on the amount that investors would be willing to pay to receive the income that the property could be expected to yield...." 9 DCMR § 307.5 (1986). That approach

> entails deriving a "stabilized annual net income" by reference to the income and expenses of the property over a period of several years. That annual net income is then divided by a capitalization rate—a number representing the percentage rate that taxpayers must recover annually to pay the mortgage, to obtain a fair return on taxpayers' equity in the property, and to pay real estate taxes.

*Rock Creek Plaza–Woodner*, 466 A.2d at 858. In conducting the analysis in this case, the assessors determined the estimated market value of the property by using a "stabilized net income" figure and applying a capitalization rate to arrive at a total value. The stabilized net income figure of $1,797,588 was obtained by multiplying the square footage of the finished area in the building by $11.50. The assessors then capitalized this income figure to arrive at an estimated market value of $14,520,500.

Appellants argue that the District's "income" approach was flawed because the assessors disregarded the actual income and expenses of the building in favor of creating an estimated "stabilized net income." We rejected a similar argument in *Washington Sheraton*, however, where we held that

> [e]stimated market value is not determined, as [appellant] suggested, by reference to "income available to the property as of the assessment" but by reference to "income earning potential." The fundamental notion that the market value of income-producing property reflects the "present worth of a future income stream" is at the heart of the income capitalization approach.

499 A.2d at 115 (citations omitted); *see* 9 DCMR § 307.5 (1986). Actual earnings, of course, may be relevant evidence of a building's future "income earning potential," but it is the future potential, not the current earnings themselves, that must constitute the legal basis for valuation. In assessing 1001 Connecticut Avenue, therefore, the District was not required to confine itself to current earnings but could take into account other information relevant to estimating the future income stream an investor could expect from the building. And the trial court found that the District had done just that:

> [The assessors] obtained the [stabilized net income] figure by examining the income and expense statements for the subject property for 1983, and earlier years and the income streams for numerous other office buildings in the city.... Mr. Davis had also examined the income for the subject property for at least two years and market data for other income producing properties in the city. Mr. Davis and Mr. Klugel also reviewed equalization charts.

Order at 4–5.

One reason, under the income method, for the focus on future income potential is that the actual income from the building may not reflect what a reasonable buyer "would be willing to pay to receive the income that the property would be expected to yield." 9 DCMR § 307.5 (1986). For instance, if the income from the building is depressed because the owner entered into below-market leases that were not arm's length transactions, the income stream of the building owner would not necessarily reflect the total income-earning potential a willing buyer could expect from the building. *See Folsom v. County of Spokane*, 106 Wash.2d 760, 769, 725 P.2d 987, 992 (1986) (en banc). In the most egregious cases, landlords and tenants could manipulate rent levels and other economic variables to minimize tax payments. *See, e.g., Safeway Stores*, 525 A.2d at 211–12 (discussing use of sale and leaseback arrangements to minimize taxes if District were required to base assessment on actual rent levels.) Similarly, if a below-market lease would expire by its terms within a short time so that a willing buyer could be expected to ignore its short-term burden on the property's income-earning potential,

such a lease should not necessarily constrain an assessor's exercise of judgment in determining market value. *See Folsom,* 106 Wash.2d at 769, 725 P.2d at 992. On the other hand, a purchaser would probably be unwilling to pay full market value for property encumbered by long-term below-market leases which the purchaser would be required to assume, unless the lease permitted the lessor to pass the tax burden on to the lessees. *See id.* 106 Wash.2d at 767, 725 P.2d at 991. The fact is:

> The amount of rental fixed by a lease, even though negotiated at arm's length, could be very misleading, as to true value of property, for it is well known that many rental contracts may be at excessive or inadequate rentals because of poor business judgment on the part of one party or another[, or because long-term contracts were] made in boom times or in times of depression. . . .

*People ex rel. Gale v. Tax Comm'n,* 17 A.D.2d 225, 230, 233 N.Y.S.2d 501, 506 (1962). *See also* 72 AM.JUR.2D *State and Local Taxation* § 760 (1974); Annotation, *Income or Rental Value as a Factor in Evaluation of Real Property for Purposes of Taxation,* 96 A.L.R.2d 666, 678–79 (1964).

 We need not decide how leases under various circumstances should be considered in determining market value. We can say on this record, however, that the trial court did not err in refusing to determine value solely by reference to income from the building's leases. Proper application of the definition of "estimated market value" found in § 47–802(4) requires consideration not merely of actual earnings but of an adjusted income figure reflecting a variety of factors (including the impact of current leases) that influence the market value of the potential income stream of the building.

The trial court was aware that below-market leases encumbered the property. The court, however, correctly discounted the importance of these leases for an accurate income valuation on this record. The court noted that

> [Mr. Wolf] conceded that an investor would look at 5 years of income and expenses to make projections [of future income]. [Moreover, he] failed to make an adjustment for the substantial income loss for the property due to the substantial rent concession given his law firm. The failure to project the potential income for the property is inconsistent with the income approach to value. The failure to make adjustments for rents substantially below market which [adjustments] could be achieved [through anticipated expiration of the leases] within a reasonable period ignores the income potential for the property. Therefore, this analysis should be rejected.

Order at 7.

Under these circumstances, we sustain the trial court's view that the District's use of past earnings and other market data to determine future income potential was consistent with our precedents and with statutory requirements.[6]

### B.

 An assessor may also employ the comparable sales approach to real property valuation. This approach "bases assessed value on the price or prices at which *reasonably comparable* properties have re-

---

**6.** Appellants also contend the trial court erred in rejecting their proposed valuation of $10,356,-360 (the tax year 1984 evaluation) because the trial court incorrectly criticized appellants' failure to estimate the respective values of the land and improvements separately and because the court also failed *sua sponte* to adjust appellants' valuation by the $45,000 rent concession received by Wolf's law firm, which would have added $396,690 to the estimated market value of the property. Appellants' criticisms, however, mischaracterize the court's findings. The court rejected appellants' proposed valuation because

it found that: (1) appellants' conclusion that the value of the property did not increase between 1983 and 1985 was not supported by the facts, since real property values in the area had been increasing at "a significant rate"; (2) appellants failed to estimate income over a five year period, relying instead on a look at one year's annual income (Tax Year 1984); and (3) appellants failed to adjust their income approach by neglecting to account for all the below-market leases soon to expire, not merely by forgetting to adjust for the substantial rent concession to the Wolf law firm. We see no error here.

cently sold." 9 DCMR § 307.3 (1986) (emphasis added). Similarly, D.C.Code § 47–820(a) provides that the District shall take into account "sales information on *similar types* of real property." (emphasis added); *see* 9 DCMR § 307.1(b) (1986).

Appellants contend the trial court erroneously accepted the District's comparable sales data because the District gave no testimony regarding the leases, the physical condition, or the acquisition financing terms which would have a significant bearing on the total sales prices of the comparable property. Without such testimony, appellants contend, comparability cannot be shown because gross prices are meaningless.

The statute and regulations that define the comparable sales approach refer to comparisons of "similar types" of property and "reasonably comparable" property, recognizing that different properties will rarely be identical and thus that comparable sales data need not reflect perfect comparability. In this case, the court found that the assessors compared recent land sales in which

> prices for the properties ranged from $422.63 to $1,194.40 per square foot of land area. [Appellants'] property was valued at $690 per square foot of land area.... The assessor's estimate of value took into account differences in the location, size, configuration and other characteristics which make one property more valuable than another.

Order at 3. The court then found that the assessors compared recent building sales using the comparable sales approach:

> [The assessor] analyzed building sales west of 15th Street. Among these were 1250 Connecticut Avenue, 1000 16th

Street, N.W. and 1625 K Street, N.W. Like the subject property, each of these properties are older buildings. The Connecticut Avenue property sold for $156.82 per square foot of finished area; the Sixteenth Street property, for $75.45 per square foot of finished area; and the K Street property, for $107.48 per square foot of finished area. The value of the subject property was estimated by the assessor at $93.53 per square foot of finished area. This figure represents a reasonable and conservative estimate of value in view of other sales and upon review of the indicated value obtained by the income capitalization approach.

*Id.* at 4. When the District has selected buildings that are "reasonably comparable" to the building subject to assessment (based on such usual criteria as location, age, and configuration), the District is entitled to presume that the sales prices for the buildings reasonably reflect market prices properly used for comparable sales analysis. *See, e.g., Shawmut Inn v. Town of Kennebunkport,* 428 A.2d 384, 395 (Me. 1981) (recent public sale of real property is evidence of market value). The District need not undertake laborious comparisons of acquisition financing arrangements to conclude that buildings sold within approximately the same time frame were subject to similar market forces.

"[A] taxpayer bears the burden of proving that an assessment is incorrect or illegal...." *Safeway Stores,* 525 A.2d at 211; *see* Super.Ct.Tax R. 11(d).[7] Appellants accordingly were entitled to introduce evidence regarding the financing, lease terms, and other characteristics of the buildings used in the District's comparable sales analysis,[8] and to attempt to prove that there was something unusual about

---

7. Super.Ct.Tax R. 11(d) provides:
 (d) *Burden of proof.* The burden of proof shall be upon the petitioner, except as otherwise provided by statute. In respect to any new matter pleaded in its answer the burden of proof shall be upon the respondent.

8. Appellants maintain that much of the information regarding the characteristics of comparable buildings was not available to them. Applicable regulations, however, specifically provide that the "[r]ecords of individual properties, includ-

ing any notes, memoranda, and statement(s) indicating the basis upon which the real estate has been assessed, shall be open for inspection by the taxpayer...." 9 DCMR § 309.2 (1986). Furthermore, leases for more than one year cannot be created "except by deed," D.C.Code § 45–306 (1990), requiring the recording of such leases to make them effective against subsequent purchasers. *See id.* § 45–801. In these ways, appellants could have obtained initial data regarding the existence of long-term leases.

these arrangements that affected the reported sales prices in a way that caused them not to reflect normal sales prices for buildings comparable to the one under assessment. Appellants, however, introduced no evidence of any kind to challenge the District's choice of comparable properties. Appellants, therefore, have failed to rebut the District's comparable sales analysis.

## IV.

■ Finally, appellants contend the trial court erred in failing to release them from the burden of proving that the District's original 1986 assessment of $14,620,500 was incorrect. They argue that by attempting to prove the proper assessment for 1986 should have been $17,830,000, the District "abandoned" its original $14,620,-500 assessment and thus assumed the burden of proving that the entire revised $17,-830,000 assessment was correct. According to appellants, if the District failed in carrying that burden, then the entire 1986 assessment failed, leaving in place the last assessment conducted in accordance with law: the $13,539,022 assessment levied by the Board of Equalization and Review for tax year 1985. *See Burlington Apartment House*, 375 A.2d at 1056.

Appellants argue, more specifically, that under Super.Ct.Tax Rule 11(d), see *supra* note 7, the District was required to assume the burden of proof "[i]n respect to any *new* matter pleaded in its answer" (emphasis added), which in this case meant the burden of proof regarding to the entire new assessment. We disagree. The original assessment of $14,620,500 obviously implied that the property was worth at least that amount. The newly proposed assessment is consistent with that proposition. The fact that the District now contends the property is worth even more cannot, for that reason, shift from the taxpayer to the District the burden of proof as to the lower figure, which the District has always stood behind. If anything, the District's proposed increased assessment has placed even greater emphasis on the District's position that $14,620,500 is not too high. Ac-

cordingly, the burden remains on the taxpayer to establish the contrary.

Appellants also rely on *District of Columbia v. ACF Indus., Inc.*, 122 U.S.App. D.C. 12, 350 F.2d 795 (1965), for the argument that once the District explicitly disclaims reliance on its original legal position, it assumes the burden of proving the correctness of its entire new case. *See id.* at 15 n. 11, 350 F.2d at 798 n. 11. Appellants' argument, however, is inconsistent with the facts of this case. The District's witness, Klugel, testified that the District was "not backing off where we were originally" and that the original assessment figure was correct based on the information available at the time. Rather, the District increased its assessment based on data submitted by appellants in support of their petition for refund to the Superior Court. The trial court specifically credited the assessor's testimony in its findings of fact: "[Mr. Klugel] states, however, he was not 'backing off' from where the assessment was in tax year 1986." Order at 9. Unlike the situation in *ACF Industries*, the District neither "abandoned" its original data nor changed its legal theory.

Under Super.Ct.Tax R. 11(d), then, the burden of proof shifted to the District only with respect to the new data it introduced to support an increase over the original $14,620,500 assessment for 1986—an assessment which the Board already had approved. The burden therefore remained with appellants to prove the incorrectness of the original 1986 assessment. *See Brisker*, 510 A.2d at 1039. Because appellants failed to carry that burden, see *supra* Part III, the trial court correctly upheld the Board's decision affirming the District's 1986 proposed assessment.

*Affirmed.*

SCHWELB, Associate Judge, concurring in the judgment:

In light of *Brisker v. District of Columbia*, 510 A.2d 1037, 1040 (D.C.1986), I believe that I am compelled to vote to affirm the decision of the trial court. I do so with considerable reluctance, however, for I have serious concerns as to whether the

taxpayer was treated fairly or even rationally by the District's "revenue men," here the officials of the Department of Finance and Revenue (DFR). Accordingly, although there is much in Judge Ferren's opinion for the court with which I can agree, I join only in the judgment.

## I

The sequence of events in this case would surely startle a reasonable person not versed in the technical intricacies of the assessment process or familiar with the strictures of the "clearly erroneous" rule. For tax year 1985, DFR assessed the property at $14,620,500, an increase of more than four million dollars over the previous year. Upon the taxpayer's appeal, the Board of Equalization and Review (the Board) determined that the property had been over-assessed by $1,080,478, and reduced the assessment to $13,539,022.

When the time came for DFR to assess the value of the taxpayer's property for 1986, however, something occurred which I, at least, find quite remarkable. DFR's new assessment was $14,620,500—exactly the same amount which the Board had disapproved the previous year, not a penny more, not a penny less.[1]

Theoretically, there could be two different explanations for this denouement. The first is that DFR accepted the decision of the appellate tribunal which had reduced the assessment the prior year, but that by some strange coincidence there were new market developments which had increased the value of the property by $1,080,478— exactly the amount by which the Board had reduced the prior assessment. I suppose that anything is possible, but the problem with this hypothesis is that it roughly resembles the notion that the toss of an unbiased coin came out tails a few hundred times in succession. Most reasonable peo-

ple would, I think, share my skepticism about this being what happened.

The second possibility is that the folks at DFR did not much care for the Board's ruling and decided, in effect, to ignore it. We would hardly need the transcript in this case to hazard a guess, based on the comparative rarity of bizarre coincidences, that this second scenario seems a great deal more plausible than the first. But the implausibility of the first hypothesis becomes quite pronounced when we learn of some truly astonishing testimony by Troy Davis, the District's line assessor. Mr. Davis explained that after he had analyzed all of the assessments, sales, and other pertinent data, he agreed with the view of his superior, Robert L. Klugel, Chief of DFR's Real Property Tax Section, that "the Board results were ludicrous." When the judge asked him whether he had "overruled the Board," Mr. Davis answered with a simple "yes."[2] In other words, Mr. Davis told the Board, though not to its face, where it could take its "ludicrous" ideas about the value of the taxpayer's property.

This is surely rather troubling testimony. Under our statute, the Board is an impartial arbiter to which the taxpayer is entitled to appeal if he or she contends that the property has been over-assessed. See D.C.Code § 47–825 (1990). An equalized assessment by the Board is entitled to the same treatment, for purposes of future valuation of the property, as a judicial decision. District of Columbia v. Burlington Apartment House Co., 375 A.2d 1052, 1056 (D.C.1977) (en banc). It is one thing to say that the Board's 1985 assessment does not bind DFR in 1986 because the facts have changed. It is quite another to legitimize the notion that DFR can lawfully ignore the Board because it finds that agency's opinion to be "ludicrous."

---

1. Subsequently, after the taxpayer had the temerity to challenge DFR's assessment in court, DFR amended its answer to claim that the value of the property was not $14,620,500 after all, but $17,830,000—an increase of more than 3.2 million dollars!

2. Mr. Davis' responses were perhaps blunter than, but not out of line with, the testimony of Mr. Klugel, who proclaimed that he was "absolutely not" bound by the Board's 1985 assessment. Mr. Klugel, however, justified his answer on the ground that "change is going on all the time."

In *Mutual Benefit Life Ins. Co. v. City of Newark*, 35 N.J.Super. 113, 116, 113 A.2d 185, 186 (1955), the court said:

> True value cannot be established for tax purposes upon an assumption that a prior assessment, unappealed from, is correct.... For if the earlier assessment is erroneous, then a decision as to the later year, which is predicated upon that assessment, would only continue the error.

In the present case, in which the appeal from the 1985 assessment resulted in what amounted to a reversal, the foregoing principles apply *a fortiori.*

"It is of the essence of an assessment that it fixes value as of a certain time. Each annual proceeding is separate and distinct from every other." *People ex rel. Hilton v. Fahrenkopf*, 279 N.Y. 49, 52, 17 N.E.2d 765, 766 (1938). It has been held that a judgment in an earlier tax appeal does not conclusively establish the value of the property at the earlier date, even as between the parties to the earlier appeal. *See In re Net Realty Holding Trust*, 128 N.H. 795, 799–800, 519 A.2d 313, 316–17 (1986) (Souter, J.). Some courts, on the other hand, have applied the doctrine of collateral estoppel under such circumstances. *See Uniroyal, Inc. v. Board of Tax Review*, 182 Conn. 619, 634, n. 9, 438 A.2d 782, 789 n. 9 (1981); *cf. Lethin v. Department of Revenue*, 278 Or. 201, ——, 563 P.2d 687, 689 (1977). In any event, if the 1986 assessment was to be the same as, or even based upon, the previous year's, logic surely requires that it should conform to the amount approved by the Board, and not to the higher amount rejected by it. I am inclined to agree with the Supreme Court of New Jersey in *Pitney v. State Bd. of Tax Appeals*, 136 N.J.L. 157, 159, 55 A.2d 6, 7 (1947), that at least as between DFR's 1985 assessment and the Board's,

> [s]ince there was no evidence indicating that there had been a change of value for the years in question from that adopted and affirmed for the previous year, we think that the parties are bound by the results of the contest.

*See also* 16 STEPHEN M. FLANAGAN, MCQUILLIN ON THE LAW OF MUNICIPAL CORPORATIONS § 44.111, at 392–94 (3rd rev. ed. 1984).

Aside from DFR's disregard of the action of the Board, there remains the question how it can be, if DFR studied the value of the taxpayer's property anew, that the result in 1986, ostensibly based on a consideration of extensive newly-acquired information, could be identical to the 1985 assessment. "It should be obvious that absent [attention to intervening developments], the carrying over of assessments each year from one general revaluation to the next is not the proper discharge of the assessor's function." *Tri–Terminal Corp v. Borough of Edgewater*, 68 N.J. 405, 414, 346 A.2d 396, 401 (1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976).

Both Mr. Klugel and Mr. Davis testified that they had studied new data for 1986 which had not been available for 1985. During the part of his testimony when he was so assuring the court, Mr. Klugel described the information which DFR studied in 1986, but which was unavailable in 1985, as quite extensive. He insisted that the new data included information about the income and operating expenses of some 500 office buildings, about leases, about interest rates, about land sales, about construction costs, and about "every aspect of valuation as far as we're concerned." Nevertheless, this newly-acquired knowledge did not, at least initially, result in the change of the 1985 assessment by a single penny.

Both Mr. Klugel and Mr. Davis were also asked to explain why the figures for the two years were identical; neither, at least in my judgment, was able to provide even a reasonably plausible answer. What Mr. Davis did say in his deposition, and to some extent reiterated in court, was that Mr. Klugel "recommended" that he use the 1985 figure, and that he agreed. Curiously, in attempting to explain why the assessments for the two years were the same, Mr. Klugel stated, contrary to the implications of his earlier testimony summarized above, that "there was a *very limited* amount of available additional market evi-

dence." He decided that "we should hold primarily the existing assessments intact to the extent that we had again reviewed all of this [sic] data. . . ." This is pretty close to carrying over to 1986 the assessment which the Board had disapproved for 1985.[3]

Neither Mr. Davis' overruling of the Board nor the identity between DFR's 1985 and 1986 assessments appears to have troubled either the trial judge or my colleagues in the majority. The Corporation Counsel devoted only one page of his brief to the issue whether DFR in fact conducted an authentic new assessment in 1986. The problems which I have discussed are not mentioned at all in the trial judge's decision, and are treated quite summarily in the majority opinion. I find this all quite perplexing.

Coincidences do happen, but not all that often. Where a party's evidence is believable only if an otherwise unlikely coincidence has occurred, the trier of fact ought in my view to be wary of crediting it, especially where, as here, no intelligible explanation of the coincidence has been provided. Mr. Klugel's testimony was characterized by a major contradiction; he said he had lots of new information in 1986 (which purportedly tended to show that a new assessment had been made), but subsequently claimed that there was hardly anything new (so that the identity of the two assessments was supposedly not surprising). If courts should be "earthy" and practical in their evaluation of street encounters between the gendarmerie and the citizenry, *see Cooper v. United States,* 368 A.2d 554, 557 (D.C.1977), then a similar adherence to hard-nosed realism is surely à propos when the clash is between taxpayers and revenue agents.

In *Burlington, supra,* a five-member majority of this court, sitting en banc, appeared to share my present skepticism af-

ter a disapproved assessment for one year came up unchanged for the next:

> Prior to the hearing on the contested 1973 assessment, Burlington received a notification from the District of the assessment on the property for fiscal year 1974. The figure thus conveyed was exactly the same as that which had been set for the previous fiscal year by the Board of Equalization and Review, which then was in the process of being disputed in Superior Court. It is clear that the 1974 figure was not based upon a reassessment utilizing updated sources of information, but rather was simply a routine repetition of the challenged 1973 assessment.

375 A.2d at 1056 n. 8. A three-member minority protested that

> [a] majority of the en banc court, at the urging of appellee, concludes without basis that because the fiscal 1974 assessment of appellee's property was the same as the equalized figure for fiscal 1973, no subsequent valuation of the property was made according to law. There is, of course, no testimony of record from which such a conclusion could be drawn.

*Id.* at 1059 (Kelly, J., dissenting) (footnote omitted). A reading of the two opinions together suggests that the members of the majority, just like the undersigned, were dubious about the plausibility of odd coincidences and were ready to infer from the identity of the numbers that there had been no genuine reassessment for the second year.

In *Brisker,* however, a division of this court interpreted *Burlington* differently:

> *Burlington* did not hold, as taxpayers assert, that subsequent assessments that are identical to the assessment found invalid are themselves necessarily invalid. Rather, *Burlington* held that when

---

**3.** In *District of Columbia Redev. Land Agency v. District of Columbia,* 106 Daily Wash.L.Rptr. 2257, 2264 (D.C.Super.Ct. Dec. 15, 1978), (the *DCRLA* case), Judge Penn held that affidavits from the very same Mr. Klugel and from another subordinate, stating that they had reviewed new data and that each "saw no reason to change his prior assessment [which had been

disapproved by the court] and that he assigned the same value for the second year," were insufficient to show that a new assessment had been made. Mr. Klugel changed his phrasing slightly in the present case but, unlike my colleagues, I see little difference, in the context of the real world, between the affidavits in *DCRLA* and Mr. Klugel's testimony described above.

the trial court finds an assessment invalid and itself sets a valuation, that "valuation must constitute the continuing basis for taxation until there is a superseding valuation which has been made according to law." *Burlington,* 375 A.2d at 1056. After an invalid assessment, the law requires the District make a new valuation in accordance with the statute. *Id.* Here, with respect to the 1984 assessments, the trial court found that the District had made such a new valuation based on comparable sales, notwithstanding the assessor's testimony that in the course of doing so, he had looked at the 1983 assessments.

510 A.2d at 1040. Fairly or unfairly, *Brisker* seems to me to represent the graveyard of the taxpayer's hopes in this case in light of the trial judge's findings of fact, for the decision appears to legitimize such findings.

The present case arguably differs from *Brisker* in two respects. First, there is no suggestion that, in *Brisker,* the DFR agents acted out of a belief that the court's action disapproving the prior assessment had been "ludicrous." Second, there is no indication that the court was asked in *Brisker* to mistrust purported coincidences, or that it ever considered that question. Neither distinction, however, seems to me to be sufficient to take the present case out of *Brisker's* reach. Even if DFR's *words* in *Brisker* were less contemptuous of higher authority than those of Mr. Davis, its *deeds* were the same as those of DFR here. Moreover, the problem of coincidences was there in *Brisker* for anyone who cared to address it, and its presence apparently did not inhibit the court from affirming findings predicated on a coincidence similar to the one in the present record.

Moreover, when a taxpayer appeals to the Superior Court, the whole case, both facts and law, is subject to *de novo* evaluation. *Washington Post Co. v. District of Columbia,* 596 A.2d 517, 521 n. 2

(D.C.1991) (citations and internal quotation marks omitted). Both the Board and the trial judge sustained a 1986 assessment identical to that proposed by DFR in 1985. The contention that the court should have adopted for 1986 the Board's reduced assessment for 1985, rather than DFR's original proposed assessment for that year, is in some measure undercut by the Board's own action with respect to 1986.[4] Under all of these circumstances, and in light of *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971), I am not prepared, despite my pronounced misgivings, to vote for reversal of the judgment.

## II

DFR's troubling initial handling of the 1986 assessment was compounded by what followed after the taxpayer sought judicial review. The District, as I have noted, eventually amended its answer and alleged that the correct assessment for 1986 should have been $17,830,000 rather than $14,620,500. This was an increase of more than 3.2 million dollars, or about 22 percent. The taxpayer contends that by abandoning the original lower assessment, the District relieved him of the obligation to prove that the original assessment was incorrect. Although I agree with the District's conclusion that this contention should be rejected, I cannot agree with its articulation of the issue.

Mr. Klugel testified that, in asking that the property be assessed at $17,830,000, he was not "backing off ... where we stood for tax year 1986." The trial court accepted this formulation. But what the District is saying when it asserts its "no backing off" theory is essentially that it can have its multi-million dollar cake and eat it too. When Mr. Klugel testified that the correct assessment of the property was more than 17.8 million dollars, allegedly on the basis of new information[5] provided by the tax-

---

4. I wonder if the Board would have approved the 1986 assessment if its members had known that it was predicated on Mr. Davis' belief that the Board's action the previous year had been "ludicrous."

5. It is important to note that the "new information" on which Mr. Klugel predicated the proposed 3.2 million dollar increase in the assessment was not the same "new information" which DFR had available for its original 1986

payer, he was necessarily opining that it was not worth just over 14.6 million dollars, as DFR had originally asserted. The correct value cannot be both 17.8 million and 14.6 million at the same time. To say that Mr. Klugel was not "backing off" his earlier assessment is to give that colloquialism a new meaning. I think that the taxpayer's argument fails, however, for the reasons articulated by my colleagues. *See ante*, majority opinion at [1312].

But the District's attempt to increase the assessment by more than three million dollars to 17.8 million dollars and change [6] presents us with a new "coincidence" problem regarding the judge's findings. The District's ultimate submission was that *incomplete* information supported a valuation of 14.6 million dollars, but that on the basis of *complete* data (including material furnished by the taxpayer), the proper assessment was 17.8 million dollars. The trial judge, however, found on the basis of the *complete* information that the property was worth 14.6 million dollars. I suppose that the result is defensible on the theory that the original assessment, even if made on incomplete information, is presumed correct, and that neither side proved it wrong. Nevertheless, I am troubled by the intrinsic improbability characterizing the judge's finding as to the value of the property.

Moreover, I am concerned by the implications of the District's amendment of its answer. Our city is in a financial crisis which threatens the jobs of its employees, as well as many essential services to its citizens. If it is true, as Mr. Klugel asserted, that the correct value of the taxpayer's property was more than $17.8 million, then it ought to have been assessed in that amount in the first place. If DFR needed more information to perform a proper assessment, it ought to have asked for it. Our citizens are being seriously shortchanged if commercial buildings are being

substantially under-assessed because DFR lacks sufficient data.

But it is troubling, at least to me, that this large increase in DFR's assessment— more than twenty percent—came about as a result of the taxpayer's exercise of the right to request judicial review of some very shaky decisions by the bureaucracy. I do not know what the intent of the amendment of the District's answer was,[7] but its logical consequence was to send a rather frightening message—challenge us in court and we will try to make you feel it in your wallet! Another taxpayer who has a legitimate grievance may well think again before seeking judicial review if the result is likely to be a claim by the District that he owes tens of thousands of dollars more to the tax man than the tax man had previously contended.

I recognize that if DFR learns during litigation that a taxpayer's property has been substantially under-assessed, it has an obligation to the citizens of our community to right that wrong. The trial judge's findings in this case, though, indicate that there was no such under-assessment. If the judge was right, then the stern message emanating from DFR turns out to have been altogether gratuitous. If at all possible, in any event, the agency should obtain all necessary information before the original assessment, and avoid placing a formidable chill upon the taxpayer's exercise of the right to seek judicial redress.

### III

It is important not only that justice be done but that it appear to be done. I do not think that the taxpayer in this case believes that he has been fairly treated. I can well understand his point of view. If it were the court's function to dispense its members' personal notions of fairness, I would vote to reverse. But

---

assessment but not for its 1985 assessment. The increase to $17,830,000 was based on documents made available by the taxpayer in connection with the lawsuit.

**6.** If $30,000 can be described as "change."

**7.** *But cf. Rabinowitz v. United States,* 366 F.2d 34, 56–57 (5th Cir.1966) (en banc): "The [DFR officials] must be held to have intended the natural result which flowed from their conduct.... The fruits of the harvest were clear to anyone who cared to look."

[o]ur duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done.

*Bifulco v. United States,* 447 U.S. 381, 402, 100 S.Ct. 2247, 2259, 65 L.Ed.2d 205 (1980) (Burger, C.J., concurring). With only limited confidence that justice has been achieved, I concur in the judgment.