[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 314.]

SOUTH EUCLID/LYNDHURST BOARD OF EDUCATION, APPELLEE, *v.* CUYAHOGA

COUNTY BOARD OF REVISION; C.I.A. PROPERTIES, APPELLANT.

[Cite as *S. Euclid/Lyndhurst Bd. of Edn. v. Cuyahoga Cty. Bd. of Revision*,

**1996-Ohio-165.**]

*Taxation—Real property valuation—Sale/leaseback transaction—Best evidence*

*of property's value—Review by Board of Tax Appeals of independent*

*appraisal based upon factors other than the sale price is appropriate when*

*it is shown that sale price does not reflect true value.*

(No. 94-1726—Submitted September 14, 1995—Decided January 17, 1996.)

APPEAL from the Board of Tax Appeals, No. 92-A-1013.

———————————

**{¶ 1}** Society National Bank owned a strip shopping center ("the property"), which contained one of its branch banks, at Mayfield and Green Roads in South Euclid. In 1990, Society merged with Ameritrust Bank, creating the largest bank in Ohio and one of the largest in the country. However, Society, in the merger, acquired an Ameritrust branch three doors from its branch at Mayfield and Green Roads.

**{¶ 2}** Society employed the Ostendorf-Morris Company to sell its South Euclid branch, along with other excess branch offices. Ostendorf-Morris's agent, Thomas M. West, received instructions from Society "to obtain the highest possible selling price for the property, consistent with a reasonable rental rate for the space they might, in fact, continue to use *** [or] lease the space if they could," since Society could remain at the former Ameritrust Bank branch three doors east of the property. Society informed West that $31,500 was the amount it would pay as base rent for the existing space in the property. Society also informed West that it would pay all the other expenses for the space on a triple-net basis. Including this rent and

the rents from the other stores in the shopping center in his calculations, West determined that the correct price, if he were to sell the property and lease back the branch to Society, would be $292,000.

{¶ 3} West showed the property to prospective purchasers thirty-five to forty times and received one offer for $282,000 if Society paid $36,000 in rent, a $10 per-square-foot rate. This same prospective purchaser offered, if receiving the same rent, to pay $310,000 "if suitable financing can be obtained from Society National Bank."

{¶ 4} In the meantime, C.I.A. Properties, appellant, began pursuing purchase of the property. C.I.A. Properties offered to purchase the property for $300,000 and to lease back the branch to Society for $9 per square foot, triple-net basis. After some dickering, C.I.A. Properties purchased the property for $300,000 and leased back the branch to Society for $6.38 per square foot, triple-net basis, which was the amount of rent the bank had earlier decided it would pay. According to the testimony, this lease equated to a rental rate of $9.50 to $10.50 per square foot on a full-service, rental basis. Society transferred title to C.I.A. Properties on November 27, 1991.

{¶ 5} C.I.A. Properties then filed a complaint with the Cuyahoga County Board of Revision ("BOR"), seeking to reduce the true value of the property for tax year 1991 from the auditor's value of $783,110 to the purchase price of $300,000. The South Euclid/Lyndhurst Board of Education ("BOE"), appellee, filed a complaint in response to C.I.A. Properties' complaint. In its complaint, as amended, the BOE asked the BOR to increase the true value of the property to $961,000. The BOR, however, agreed with C.I.A. Properties and reduced the value of the property to $300,000. The BOR issued a decision to C.I.A. Properties, informing it of the reduction in the value of the property. It issued another decision to the BOE, advising it that the BOR had not increased the value of the property.

2

The BOE filed a notice of appeal with the Board of Tax Appeals ("BTA"), attaching copies of both decisions to the notice.

{¶ 6} At the BTA, the BOE presented the expert appraisal testimony of Sam D. Canitia. Canitia, on receiving the decrease complaint from the BOE, analyzed the sale price and determined that it was not consistent with the market. The first unusual factor for Canitia was the big difference in sale price versus the auditor's value, and the second one was the sale/leaseback agreement. He also concluded that the lease for the bank branch was below market.

{¶ 7} Canitia separated the property into a bank building and a retail strip shopping center for appraisal. He did this because the bank was located at the corner of Mayfield and Green Roads, fronting on Mayfield Road and nearly all free-standing, with the three remaining stores fronting on Mayfield Road. Canitia reasoned that the property appeared to be two separate entities.

{¶ 8} In his market-data approach, Canitia determined that the retail stores had a value of $45 per square foot, or $163, 000, for the retail portion of the property. He next decided that the bank building was worth $150 per square foot, or $798,000. Adding these two components together, he testified that the value of the property under the market-data approach was $960,000.

{¶ 9} In utilizing the income approach, Canitia derived a separate rental income for the retail portion of $7.50 per square foot and a separate rental income for the bank of $15 per square foot. After multiplying these rentals by the respective rental areas, he added the gross potential rental incomes together and subtracted vacancy and rent loss at five percent to derive a net income of $90,449. He capitalized this amount at 10.5 percent and determined that the value of the property under the income approach was $861,000. He correlated the valuations obtained from both approaches and concluded that the true value in money of the property, as of January 1, 1991, was $900,000.

**{¶ 10}** The BTA first found that the sale/leaseback transaction was not the best indication of the value of the property. The BTA next reviewed Canitia's report. The BTA ruled that Canitia had logically chosen his comparable sales for their similarity in size, location, and age, and had appropriately adjusted the sales for any differences with the property. The BTA also concluded that Canitia had selected clearly appropriate market-rental comparables, had deducted appropriate expenses, and had applied an appropriate capitalization rate. Consequently, the BTA determined that Canitia's appraisal reflected the true value of the property and valued it at $900,000.

**{¶ 11}** The cause is now before this court upon an appeal as of right.

_____

*Kolick & Kondzer* and *Daniel J. Kolick*, for appellee.

*Fred Siegel Co., L.P.A.*, *Fred Siegel* and *Annrita S. Johnson*, for appellant.

_____

***Per Curiam.***

**{¶ 12}** C.I.A. Properties argues that (1) the BTA should have found the sale to be the best evidence of the property's value, (2) the BOE did not establish an increase in the true value of the property, (3) the BOE appraised the property according to its current use and not according to its exchange value, and (4) the BOE's complaint should be dismissed because it attached copies of two different decisions to its notice of appeal. Since we disagree with all of these contentions, we affirm the BTA's decision.

**{¶ 13}** As to the first claim, in *Ratner v. Stark Cty. Bd. of Revision* (1986), 23 Ohio St. 3d 59, 23 OBR 192, 491 N.E. 2d 680, syllabus, we held:

"Although the sale price is the 'best evidence' of true value of real property for tax purposes, it is not the only evidence. A review of independent appraisals based upon factors other than the sale price is appropriate where it is shown that the sale price does not reflect true value. [Citation omitted.]"

**{¶ 14}** In *Ratner*, the taxpayer purchased a shopping mall center under favorable financing terms. The taxpayer presented evidence of the cash equivalency of the purchase and a fair market valuation appraisal of the property. Both of these evidentiary items indicated that the true value of the property was less than the purchase price. The court stated that the actual sale price provides strong evidence of market value. However, according to the court, certain types of transactions, albeit arm's-length transactions, call into question whether the sale price reflects the true value of the property. Among the types of sales mentioned in *Ratner*, prompting an investigation of the sale, is a sale-lease arrangement. Moreover, on two occasions, *Kroger Co. v. Hamilton Cty. Bd. of Revision* (1993), 67 Ohio St. 3d 145, 616 N.E. 2d 877, and *Cleveland Hts./Univ. Hts. Bd. of Capital Edn. v. Cuyahoga Cty. Bd. of Revision* (1995), 72 Ohio St. 3d 189, 648 N.E. 2d 811, we have affirmed BTA findings that the purchase price in sale/leaseback transactions did not establish the true value of the property.

**{¶ 15}** Here, the BTA discounted the sale price because "[b]oth the buyer and the seller wanted Society to stay at the subject location, and would not have consummated the deal if Society had not remained. Thus, the parties' primary goal was to arrive at a price where both would be satisfied enough to allow Society to lease the subject after the sale. The transaction was made to reduce Society's 'exposure' in real estate overall and to maintain its branch locations in the most optimum locations, and as a result, the selling price was dictated by the specific needs of the parties, not the market value of the property. Clearly, since Society had determined that it ultimately wanted to remain in the subject location, it was motivated to bargain for a sale price for the subject *in conjunction with* a rental rate, making concessions on the sale price for corresponding concessions in the rental rate. Based upon the information provided to this Board by appellant's appraiser, those rates are not supported by market data. ***" (Emphasis added in part.)

**{¶ 16}** We agree with this analysis. This transaction, concededly an arm's-length transaction, does not reflect the true value of the property. Canitia and West agreed that a willing buyer would pay less for a property if the leaseback arrangement limited the amount of rent the buyer could collect. The BTA's finding that this occurred, thus, is warranted. See *Safeway Stores v. Dist. of Columbia* (D.C. APP. 1987), 525 A. 2d 207, 212, fn. 4 ("*** [T]o accomplish this goal [of creating artificial sale and leaseback arrangements to lower property values], the sale and leaseback contract may well represent an 'arms-length' deal: both sides can benefit from a cheap leaseback as long as the sale price is sufficiently low. There need be no illicit collusion.").

**{¶ 17}** The parties also dispute whether the rent negotiated by Society was market rent. The BTA determined that the negotiated rent was not at market and that the rent assigned by Canitia after his study was. We conclude that the evidence supports the BTA's finding, and we affirm it. *Hawthorn Mellody, Inc. v. Lindley* (1981), 65 Ohio St. 2d 47, 19 O.O. 3d 234, 417 N.E. 2d 1257, syllabus.

**{¶ 18}** Second, C.I.A. Properties, in essence, disputes various aspects of Canitia's report and testimony. C.I.A. Properties did not present any competing appraisal report. As we stated in *Wolf v. Cuyahoga Cty. Bd. of Revision* (1984), 11 Ohio St. 3d 205, 207, 11 OBR 523, 524, 465 N.E. 2d 50, "[a] great deal of appellants' argument is devoted to the rebuttal of appellees' expert's testimony. Ultimately, they conclude that none of his conclusions is credible enough to be relied on by the BTA. However, such a determination is precisely the kind of factual matter to be decided by the BTA. *** There is no indication on the face of the record of any abuse of discretion, nor have appellants proven any violation by the BTA, which would render the decision unreasonable or unlawful."

**{¶ 19}** Next, C.I.A. Properties complains that the BTA valued the property on its current use, not its value in exchange, because it adopted Canitia's valuation despite Canitia's admission that he valued it as a bank and three retail stores. C.I.A.

Properties quotes from *Dinner Bell Meats, Inc. v. Cuyahoga Cty. Bd. of Revision* (1984), 12 Ohio St. 3d 270, 271, 12 OBR 347, 348, 466 N.E. 2d 909, 910-911, in which we stated:

"Initially we note that Section 2, Article XII of the Ohio Constitution mandates that valuations of property cannot be limited to considerations of current use only to the exclusion of all other relevant factors."

{¶ 20} However, C.I.A. Properties fails to quote the next sentence, which states: "It does not prohibit altogether any consideration of the present use of a property." *Id.* at 271, 12 OBR at 348, 466 N.E. 2d at 911. We conclude that the BTA properly regarded Canitia's report in light of his considering the property for its present use as well as for any future uses.

{¶ 21} Finally, C.I.A. Properties claims that the BTA should have dismissed the notice of appeal because the BOE attached copies of both the BOR's decisions to the notice of appeal. The BTA explained that the BOR issued a decision on C.I.A. Properties' complaint, reducing the value of the property, and one on the BOE's complaint, denying an increase in the value of the property. Both decisions were for the same property for the same tax year, stating the same value for the property. The BTA found that "the dual attachment to the notice of appeal to be nothing more than 'overkill' and does not construe same to be an attempt to appeal both of the decisions from the Cuyahoga County Board of Revision. ***"

{¶ 22} R.C. 5717.01 states:

"An appeal from a decision of a county board of revision may be taken to the board of tax appeals within thirty days after notice of the decision of the county board of revision is mailed as provided in section 5715.20 of the Revised Code. *** Such appeal shall be taken by the filing of a notice of appeal, either in person or by certified mail, with the board of tax appeals and with the county board of revision. *** Upon receipt of such notice of appeal such county board of revision shall by certified mail notify all persons thereof who were parties to the proceeding before

such county board of revision, and shall file proof of such notice with the board of tax appeals.  The county board of revision shall thereupon certify to the board of tax appeals a transcript of the record of the proceedings of the county board of revision pertaining to the original complaint, and all evidence offered in connection therewith. ***"

{¶ 23} We note that DTE Form 4, the Notice of Appeal form, directs an appellant to attach a copy of the BOR decision to the notice of appeal.  However, R.C. 5717.01 does not require a BTA appellant to do so.  Cf. R.C. 5717.02.  We regard attaching a copy of the BOR decision to the notice of appeal as a non-jurisdictional providing of supplemental information.  *Nucorp, Inc. v. Montgomery Cty. Bd. of Revision* (1980), 64 Ohio St. 2d 20, 18 O.O. 3d 191, 412 N.E. 2d 947.  Attaching a copy of a related BOR decision to a notice of appeal does not result in dismissal of the appeal.

{¶ 24} "While this court has never encouraged or condoned disregard of procedural schemes logically attendant to the pursuit of a substantive legal right, it has also been unwilling to find or enforce jurisdictional barriers not clearly statutorily or constitutionally mandated, which tend to deprive a supplicant of a fair review of his complaint on the merits."  *Id.* at 22, 18 O.O. 3d at 192, 412 N.E. 2d at 948.

{¶ 25} Accordingly, we affirm the decision of the BTA because it is reasonable and lawful.

*Decision affirmed.*

MOYER, C.J., DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

_____