**SQUARE 345 ASSOCIATES LIMITED PARTNERSHIP, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 96–TX–1805.**

District of Columbia Court of Appeals.

Argued May 11, 1998.
Decided Dec. 24, 1998.

---

Gilbert Hahn, Jr., with whom Tanja H. Castro, Washington, DC, was on the brief, for appellant.

Martin B. White, Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellee.

Before STEADMAN, SCHWELB and FARRELL, Associate Judges.

STEADMAN, Associate Judge:

This is an appeal from a review by the Tax Division of the Superior Court of a commercial real property tax assessment pursuant to D.C.Code §§ 47–825.1(j), –3303 (1997). The taxpayer, Square 345 Associates Limited Partnership, challenges the trial court's valuation of its property for tax year 1989 at $36,070,735. The property, a parcel of land located at 1001 G Street, Northwest, at the time vacant except for a shell structure known as the McLachlen Building,[1] had been assessed by the District to have a value of $38,760,980.[2]

When lodging a challenge before the Superior Court, the burden is on the taxpayer to demonstrate error in the assessment. *See* Super. Ct. Tax R. 12(b). The trial court here concluded that, despite various assignments of error, the taxpayer had only succeeded in discrediting one aspect of the assessment, namely, that the assessor, Troy Davis, failed to consider the taxpayer's obligation to preserve the interior of the McLachlen Building by virtue of the building's designation as an historic landmark.[3] To reflect that financial burden, the court adjusted the $38,760,980 figure downward by $2,690,245, an amount it had determined us-

---

1. The site, covering about 39,500 square feet including the McLachlen Building, had previously been occupied by what was known as the North Building of Woodward & Lothrop, a department store. A twelve-story office building was eventually constructed on the site. *See District of Columbia v. Square 345 Assocs. Ltd. Partnership*, 706 A.2d 574, 575 (D.C.1998) (reviewing assessments on subject property, which had been improved by twelve-story office building, for tax years 1990 (second half), 1991, and 1992).

2. The assessment was upheld by the Board of Equalization and Review pursuant to D.C.Code § 47–825 (repealed 1993). Under current law, such review is undertaken by the Board of Real Property Assessments and Appeals. *See* D.C.Code § 47–825.1 (1998 Supp.).

3. The District does not appeal the trial court's conclusion concerning this omission by the assessor.

ing figures supplied by the taxpayer's expert appraiser.

The taxpayer in the present case asserts that our decision in *District of Columbia v. Burlington Apartment House Co.*, 375 A.2d 1052 (D.C.1977) (en banc), precludes the approach followed by the trial court. It argues that once error has been demonstrated in an assessment, the assessment must be disregarded for all purposes. We hold that it is within the trial court's broad discretion to accept whatever elements of an assessment the court deems valid and to make any necessary adjustments required by the evidence adduced at trial. In light of this conclusion, and because we find no grounds for reversal in the taxpayer's litany of claims relating to the trial court's factual findings, we affirm.[4]

### I.

Real property taxes in the District are based upon an assessment of the "estimated market value" as of January 1st of the year preceding the tax year in question. *See* D.C.Code § 47–820(a) (1997). The term "estimated market value" is defined in D.C.Code § 47–802(4) as

> 100% of the most probable price at which a particular piece of real property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would be expected to transfer under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other.

The taxpayer is entitled to an administrative review of the assessment, which, prior to 1993, was undertaken by the Board of Equalization and Review. See *supra* note 2. Once this remedy has been exhausted, the aggrieved taxpayer may enlist the Superior Court, Tax Division to review the assessment. *See* D.C.Code § 47–825.1(j); *District of Columbia v. Keyes*, 362 A.2d 729, 732–33 (D.C.1976). "The [Superior] Court shall hear and determine all questions arising on appeal

and shall make separate findings of fact and conclusions of law, and shall render its decision in writing. The Court may affirm, cancel, reduce, or increase the assessment." D.C.Code § 47–3303.

▮ Before the Superior Court, the case is subject to de novo evaluation on the basis of evidence presented at trial. *See District of Columbia v. New York Life Ins. Co.*, 650 A.2d 671, 672 (D.C.1994); *Washington Post Co. v. District of Columbia*, 596 A.2d 517, 521 n. 2 (D.C.1991); *Rock Creek Plaza—Woodner Ltd. Partnership v. District of Columbia*, 466 A.2d 857, 859 n. 1 (D.C.1983). However, the taxpayer bears the burden to show that the assessment it challenges is incorrect. *See* Super. Ct. Tax R. 12(b); *Wyner v. District of Columbia*, 411 A.2d 59, 60 (D.C. 1980). On appeal, we apply in tax assessment cases the same standard of review applicable to civil cases generally: "The trial court's factual findings are binding upon this court unless they are clearly erroneous; if the findings are acceptable, we will not disturb the court's judgment unless it is plainly wrong or without evidence to support it." *Wolf v. District of Columbia*, 597 A.2d 1303, 1307 (D.C.1991) (*"Wolf I "*) (internal quotation marks omitted); *see also* D.C.Code § 47–3304(a) (1997); D.C.Code § 17–305(a) (1997).

### A.

▮ Apart from questioning the court's method in calculating the reduction of the District's assessment, a matter we address immediately below, the taxpayer alleges that, as a matter of law, since the trial court found a portion of the District's assessment invalid, it had an obligation under *Burlington* to reject the entire assessment and either reinstate the most recent valid assessment or determine the valuation independently based on evidence presented at trial (and without regard to the discredited assessment). We think the taxpayer misreads *Burlington*.

▮ The taxpayer points to our statement in *Burlington* that "where an assessment is

---

4. In Part I of this opinion, we address the taxpayer's challenge to the approach taken by the trial court. The remainder of the taxpayer's arguments, primarily attacking factual determinations of the trial court with respect to the assessment, are dealt with in Part II.

based not upon a valuation made according to law but rather upon a figure determined by the court to be erroneous, arbitrary, and unlawful, the figure thus rejected must be considered a mere nullity, incapable of valid future applicability." *Burlington, supra,* 375 A.2d at 1057 (internal quotation marks omitted). But this language simply signifies that a discredited assessment must give way to the trial court's own valuation, determined by its reconciliation of the evidence presented at trial, which "becomes the basis for taxation until a subsequent reassessment has been made according to law." *Burlington, supra,* 375 A.2d at 1056. It is within the trial court's broad discretion as the finder of fact to sift through the evidence and arrive at an independent valuation. Within this process, the court may certainly credit whatever elements of the assessment it deems valid. This breadth of discretion is reflected in *Brisker v. District of Columbia,* 510 A.2d 1037, 1039–40 (D.C.1986):

> D.C.Code § 47–3305 authorizes the trial court to affirm, cancel, reduce or increase an assessment. The statute thus provides the court with broad discretion in a situation ... where it has held that both the District's proposed assessment and the taxpayers' proffered alternative assessment are flawed. In such an instance, the trial court is free to direct that the case be reopened and free even to call its own witnesses in order to create a record that will support its valuation. Another option is for the court simply to cancel the District's proposed assessment, leaving in place the last assessment carried out in accordance with the statute. *See District*

of Columbia v. Burlington Apartment House, supra, 375 A.2d at 1056. (Footnote omitted.)

In sum, we hold that the trial court was fully empowered to accept whatever elements of the assessment it deemed valid and incorporate that into its overall valuation. Here, the court credited all aspects of the assessment with the single exception of the failure to take into account the duty to preserve the interior of the building. As a purely legal matter, we can find no fault with the general approach the court followed.[5]

### B.

◼ We turn next to the merits of the taxpayer's argument regarding the specifics of the trial court's method to account for the duty to preserve the McLachlen Building's interior. As already noted, the trial court has "broad discretion in a situation ... where it has been held that both the District's proposed assessment and the taxpayers' proffered alternative assessment are flawed." *Brisker, supra,* 510 A.2d at 1040. The court may "affirm, cancel, *reduce,* or increase the assessment." D.C.Code § 47–3303 (emphasis added). In our view the taxpayer has not demonstrated an abuse of discretion, for the court's adjustment was based exclusively on the taxpayer's own figures proffered at trial. By leading to at least some not insignificant adjustment, the court's approach could even have worked to the taxpayer's advantage, given that (1) the court rejected the relevance of the 1986 sale of the subject property, which formed the basis of the taxpayer's expert's determination that the preservation requirement diminished the value of the property by twenty-five percent,[6]

---

5. We disagree with the taxpayer's assertion that this result conflicts with our decision in *Washington Post Co. v. District of Columbia, supra,* 596 A.2d at 517. In that case we held that a taxpayer "is entitled to a refund when the assessment of the 'real property'—the combination of land and improvements—is excessive, not when the allocation of value between land and improvements is erroneous." *Id.* at 520. Our decision in the present case upholds a particular trial court action undertaken after the burden of *Washington Post* had been met; the taxpayer proved that the assessment of its "real property" was excessive and the court made a proper reduction according to its view of the trial evidence. There is

nothing incongruous in the proposition that the taxpayer need prove error in the assessment of real property "as a whole," *see id.,* and that the court may, in reviewing the taxpayer's assignment of such error, accept only part of the assessment as valid.

6. To attempt to account for the historic designation of the McLachlen Building, the taxpayer's expert appraiser, Michelle Saad, reduced the sale prices for comparable properties (which contained no historic landmarks) by twenty-five percent. She testified that she arrived at this adjustment to conform the appraisal to the 1986 sale price of the subject property:

see *infra* Part II(A), and (2) the assessor testified that had he known about the interior preservation requirement the assessment would "not [change] substantially in terms of the value."

The taxpayer's own expert, Ms. Saad, testified that she reduced each of the comparable sales figures (that she consulted in calculating her appraisal of the subject property) by twenty-five percent, solely to reflect the diminution in value of the property owing to the historical landmark designation of the McLachlen Building. See *supra* note 6. Taking Ms. Saad's formulation of the burden of the *entire McLachlen Building* and applying it to the District's assessment, the twenty-five percent reduction represented a value of $9,690,245. The only concrete estimate that Ms. Saad could give of the cost of maintaining the exterior was $7,000,000.[7] Thus, the cost of maintaining the interior and, for that matter, any other costs associated with the building, would be, by Ms. Saad's figures, approximately $2,690,245. The court reduced the assessment by that amount.

Thus, the trial court's method was essentially a function of Ms. Saad's conception of the burden of the McLachlen Building as a whole on the value of the tract. Ms. Saad admitted that she had difficulty quantifying that exact burden and so arrived at a twenty-five percent reduction as a rough measure. As pointed out by the taxpayer in its brief, Ms. Saad was able to determine that two elements impacted on the cost of the requirement to maintain the building: additional construction costs and the reduced rental income available for the entire property because of the relatively small floorplate of the historic building. The taxpayer acknowledges that the $7,000,000 figure "did not

I compared what the sale of the subject was in comparison to that range of comparables and selected a rate of 25 percent to be the most representative of the—the detriment to the overall property or reduced price that one would pay for this property in comparison to the other sales.
Saad ultimately arrived at a value of $26,500,000 for the property.

7. This figure represented the cost of restoration of the exterior walls. When questioned about the figure, Saad acknowledged that she made no mention of it in her report. Saad suggested that

include restoration of the interior or the second element [of reduced rental income]." Therefore, accepting Ms. Saad's $7,000,000 figure and her assertion that the building diminishes the value of the property by twenty-five percent,[8] the $2,690,245 figure, although perhaps somewhat imprecise, was a permissible adjustment on the record before the trial court to reflect the cost of interior maintenance, the effect of the smaller floorplate, and any other such expense associated with the building besides that of preserving the exterior.

## II.

We now examine the taxpayer's additional challenges to the assessment itself.

### A. Prior Sale

In what it calls "the single most glaring error below," the taxpayer first argues that the trial court erred in upholding most of the assessment despite the assessor's failure to take account of a sale in late 1986 of the subject property for $22,000,000. We detect no error. Section 47–820(a) of the real property tax and assessment statute sets forth several assessment guidelines:

The assessed value for all real property shall be the estimated market value of such property as of January 1st of the year preceding the tax year, as determined by the Mayor. . . . *The Mayor shall take into account any factor which might have a bearing on the market value of the real property* including, but not limited to, sales information on similar types of real property, mortgage, or other financial considerations, reproduction cost less accrued depreciation because of age, condition, and other factors, income-earning potential (if

the $7,000,000 cost would be partially offset by the fact that "the property was standing and was in shell condition and the builder did not have to construct a full building." However, she could ascribe no particular value to these savings. Additionally, the court observed, and Saad agreed, that without the landmark designation the property owner would have to pay the cost of tearing down the building.

8. This reduction in value would reflect both of the elements identified by Ms. Saad.

any), zoning, and government-imposed restrictions.

(Emphasis added.) *See also* 9 DCMR § 307.1 (1996). We have recognized that where a factor is not shown to bear upon the market value, "the assessor commits no misdeed in failing to consider it." *Wolf v. District of Columbia,* 609 A.2d 672, 676 (D.C. 1992) ("*Wolf II* ").

■ The trial court found that the taxpayer failed to show that consideration by the assessor of the prior sale would have altered the overall assessment value reached. This finding is supported by the record and therefore must be affirmed. Although the sale took place on December 12, 1986, almost thirteen months prior to the January 1, 1988, valuation date for tax year 1989, there was testimony that the price had been established much earlier in a November 1983 option agreement.

Ryland Mitchell, the District's expert appraiser who, incidentally, valued the subject property even higher than the assessor, indicated that he gave little weight to the sale because he considered the price too remote to be relevant to the tax year 1989 valuation.[9] Additionally, the District's assessor, Troy Davis, testified that had he known about the sale, its impact on his valuation would have been affected by the date at which the price was determined. When asked by counsel for the taxpayer whether, had he known about it, he would have "taken that into account as the best evidence of market value of the property," Davis replied, "[w]ell based on my understanding of that—of the sale as I understand it now, no, I would not have take[n] that as the best evidence of the value of the property." He continued, "[m]y consider-

ation of this sale would have had to weigh the time frame in which the price was negotiated, was set."[10]

■ In contrast, Ms. Saad, the taxpayer's expert appraiser, indicated that she relied heavily on the 1986 sale; however, the mere presence of an alternative viewpoint does not satisfy the taxpayer's burden here to show error in the District's assessment. *See Safeway Stores, Inc. v. District of Columbia,* 525 A.2d 207, 211 (D.C.1987) ("[A] taxpayer bears the burden of proving that an assessment is incorrect or illegal, not merely that alternative methods exist giving a different result.").

We have difficulty fathoming the District assessor's failure to be aware of the 1986 sale. Nevertheless, the trial court reasonably could conclude that the 1986 sale price reflected the property's November 1983 value and, based on the explanations of Mitchell and Davis, that such a figure was too remote to have relevance to the tax year 1989 assessment.

### B. Prior Assessment

■ Second, the taxpayer argues that the trial court erred in declining to admit evidence regarding an assessment of the subject property conducted by Mr. Davis for the second half of tax year 1988.[11] The taxpayer had maintained that this assessment, effective December 31, 1987, would aid in the valuation for the following tax year, dated January 1, 1988, because the two valuations were undertaken only one day apart. The sixty-three percent valuation differential, argued the taxpayer, occurring in a single day, "requires some explanation from the assessor." The court rejected this reasoning,

---

9. Instead of relying on the 1986 sale, Mitchell placed special emphasis on a comparable property located at Indiana Avenue and 7th Street which sold at a price per square foot far greater than that reflected by the 1986 sale. Mitchell testified,

> I think it's unusual that you have this good a comparable sale as an indication of market value, and I can tell you I put heavy reliance on this sale and I think then with consideration of the subject property going back to a negotiation between the parties of 1983, which is four years prior to the time we're talking about, I interpret that as some explanation of why the price paid for the subject was so much

different from what is clearly indicated as market activity around January 1, 1988.

10. Later, Davis noted that by January 1, 1988, "the land values in the central business district were appreciating at quite an impressive rate, and so therefore the time of sale of your comparable sales was very important. A two-year difference can mean a difference between night and day in terms of consideration of a sale as a comparable as of the assessment date."

11. The taxpayer represented that this figure was $23,731,600.

holding that the 1988 assessment was irrelevant to the inquiry into the property's value for tax year 1989 because the two valuations were independent calculations spanning more than merely one day. The court noted that although the statute calls for the assessment of property on a given date, see D.C.Code § 47–820(a), the estimate of the property's value is for the entire tax year, based on comparable sales information collected over a period of time. In other words, the 1989 assessment realistically looked forward, while the second half 1988 assessment looked backward.

■ "An evidentiary ruling by a trial judge on the relevancy of a particular item is a 'highly discretionary decision' that will be upset on appeal only upon a showing of 'grave abuse.'" *Roundtree v. United States*, 581 A.2d 315, 328 (D.C.1990) (quoting *Mitchell v. United States*, 408 A.2d 1213, 1215 (D.C.1979)); *accord, Price v. United States*, 697 A.2d 808, 818 (D.C.1997). We do not find that the trial court, which was itself the finder of fact, committed an abuse of discretion here. As we suggested in *Wolf v. District of Columbia*, 611 A.2d 44, 51 (D.C.1992) ("*Wolf III*"), the fact that the trial court accepted an appraisal that represented a 37.5 percent increase in value between two consecutive tax years was of no import where the appraiser applied "detailed data" and "explained the basis for his valuation." We also noted in an earlier case that a disparity in assessments between two tax years lacked probative value because it could reflect merely a previous overassessment. *See Wolf II, supra*, 609 A.2d at 675 n. 2 (more than fifty percent disparity).

Here, Davis explained the basis for the independent, de novo tax year 1989 assessment that he conducted, which utilized a comparable sales approach. In any event, even if relevant, exclusion of the evidence in question would appear to be harmless; the taxpayer has not come forward with any evidence to suggest why the 1988, second half, assessment should be deserving of greater weight than the tax year 1989 assessment, whose methodology the trial court chiefly accepted. Furthermore, it has been

represented to us on appeal that the tax year 1988, second half, assessment was undertaken simply to adjust the full tax year 1988 assessment to reflect a "partial raze" of improvements. Therefore, the second half assessment, ostensibly conducted one day before the tax year 1989 assessment, does not appear to have involved a fresh reappraisal of the value of the tract, and there is no evidence in the record before us relating to the methods employed in conducting the full tax year 1988 assessment.

We do not mean to imply that there are no circumstances under which a previous assessment may be relevant. Indeed, as the taxpayer points out, the District's "Pertinent Data Book" for tax years 1988 and 1989, in explaining the process of mass appraisal of property, invites a comparison between previous assessments and newly developed appraisal values. However, where a full and independent assessment has been conducted for a particular property, and where no separate basis has been articulated to discredit that assessment, we cannot find an abuse of discretion in excluding a previous assessment. Under such circumstances, there is no reason to believe that the previous assessment is any more reliable than the current assessment. Here, there has been no examination of the method applied to calculate the previous assessment, and the method applied to arrive at the current assessment has been largely accepted by the trial court. There is, thus, a logical basis to exclude the former assessment as irrelevant. *See Wolf II, supra*, 609 A.2d at 675 n. 2.

**C. Requirement to Preserve Exterior**

■ Next, the taxpayer alleges that the assessor improperly neglected to consider the negative effects on value of its obligation to preserve the exterior shell of the McLachlen Building. The trial court found that the assessor did indeed consider this obligation. Contrary to the taxpayer's assertions, Davis indicated on the trial record that he was in fact aware of the requirement to preserve the exterior but determined that, on balance, it would not depress the value of the

property.[12] A colloquy between Davis and the Assistant Corporation Counsel proceeded as follows:

Q You indicated Mr. Davis, that you didn't make any adjustments as a result of the landmark status of the subject property facade, if you will, because it took up only ten percent of the land area; is that correct?

A Well, I didn't have any evidence that it was a significant detrimental effect to the property value. Particularly since it, it's—we're talking about it encumbered less than ten percent of the total land area.

Q Okay. And it's fair to say what needed to be retain[ed] as a result of ... its historic landmark status was simply the outer wall, the facade; is that correct?

A Well, that was, that was the way I understood it at that—at the time of the assessment.

Q That's what the facade is, is it not?

A Yes, facade is just the, the, outer shell which in—which very often is how—well it's how historic buildings are redeveloped by retaining the facade and, and completely rebuilding the building.

Q Retaining only the outer facade?

A Yes.

Davis acknowledged that there were certain negative aspects to the historic landmark designation—the building might be less attractive to tenants desiring a larger floor plate, and maintaining the building would restrict the size of the improvement planned for the remaining ninety percent of the land—but he also asserted that it would have the positive effect of distinguishing the property from "other run-of-the-mill buildings."

Additionally, the District's appraiser, Mr. Mitchell, testified that he attempted to quan-

tify the effect of the McLachlen Building on the 1986 sale of the subject property, but could not obtain much information from those involved therewith. As a result, Mitchell looked to the sale of a property he thought comparable to the subject property, located at 7th Street and Indiana Avenue. Similar to the subject property, this parcel contained a small historic landmark building that comprised approximately 10% of the total site. The developer preserved the landmark building and constructed a modern office building on the remainder of the site. The property at 7th and Indiana sold for $138 per square foot of floor area ratio ("FAR") on January 22, 1988, well above the $98 figure calculated by Davis for the subject property.

Given the testimony of Davis and Mitchell, the trial court could rationally hold, as we find implicit in its written decision, that the requirement to preserve the exterior of the building was taken into account in the District's assessment as not detracting from the property's overall value.[13]

### D. Origin of Base Rate

■ The taxpayer further argues that Davis' inability to explain the origin of a computational standard used to calculate the assessment rendered the assessment arbitrary and, consequently, invalid. The standard, known as the "basic rate," was set at $65 per square foot of FAR to function as a uniform calculational starting point applicable to properties comparable to the subject property. The figure is meant to approximate the value of an average parcel within a given zone of real property, and is adjusted to account for the peculiar characteristics of a particular parcel.[14] Although neither party

---

12. Davis assessed the McLachlen Building to have only a nominal value of $1000.

13. Of course, as already indicated, the taxpayer had put on contrary testimony, but the trial court was not obliged to accept it for the purpose of determining the validity of the District's assessment as an appropriate initial figure. That determination was quite distinct from the trial court's utilization of the totality of the taxpayer's figures in adjusting, to the taxpayer's benefit, for the assessor's failure to consider the interior preservation requirement. Contrary to the tax-

payer's assertion, we do not think the trial court was inconsistent on this point. It made a reasonable calculation based on the ascertainable data before it.

14. In arriving at his assessment, Davis multiplied the basic rate by 1.2 to reflect the fact that the property faced on two street corners and by 1.25 to reflect "assembly." He then multiplied the new figure ($98) by 10 to reflect the allowable FAR for the site and in turn by the square footage of the site, to reach his assessed value of $38,760,980.

explained at trial the precise derivation of the "basic rate," it was spoken of generally as a figure computed by the Office of Standards and Review, a division of the Department of Finance and Revenue, from an examination of "[c]entral business district [real property] sales occurring in 1987 east of 15th Street ."

In its brief, the taxpayer points out that "Mr. Davis apparently attempted to select a relevant unit of comparison by deriving the 'basic' rate. . . . Mr. Davis could not describe how he developed the $65 rate because he could not remember which sales he and Standard[s] and Review used. There is thus no assurance that this rate is a relevant unit of comparison." This argument confuses the burden of proof applicable to tax assessment cases. *See* Super. Ct. Tax R. 12(b).

As we stated in *Wolf II,* 609 A.2d at 675, where the taxpayer claimed that an assessment was invalid because the " 'assessor merely used a predetermined mathematical formula and his calculator,' "

> Section 47–821(a) [of the D.C.Code] provides, in relevant part, that "[t]he Mayor shall assess all real property, identifying separately the value of land and improvements thereon." That is what the assessor did in this case. The fact that he did so by formula—taking into account the property's site and corner location and its square footage—is of no consequence, unless appellants can prove either that the basis of the formula is unlawful or that the assessor's computation of the formula in this case was inaccurate.

In *Wolf II* the taxpayer asserted that the assessor used arbitrary figures in his calculation, a claim we rejected in the absence of "evidence at trial to support" it. *Id.*

In the instant case, no evidence has been adduced to challenge the derivation of the $65 basic rate with the exception of Davis's testimony that he had some role in developing the figure but yet could not explain its origin. In this regard, the trial court found as follows:

> Mr. Davis ... in making his assessment, started with a "basic rate" or "locational rate" of $65/FAR, which was given to him by the Office of Standards and Review, a

division of the Department of Finance and Revenue. He provided no basis for the $65 basic rate other than that the Office of Standards and Review furnished it to him. He did indicate, however, that he participated in a limited way in assisting Standards and Review in compiling the data to obtain the rate.

This description is consistent with our reading of the record.

The inability of Davis, who had some role in developing the basic rate, to explain its derivation was quite insufficient to meet the taxpayer's burden of proof on the issue of invalidity. Davis was one of several participants in the computation of the figure; other officials at the Standards and Review office would have had to be questioned to adequately impeach the methodology. Moreover, the cross-examination of Davis simply revealed that he did not recall how the basic rate was derived; it in no way attacked directly the process undertaken to make the calculation, and the taxpayer offered no evidence on this score. Additionally, the trial court could have viewed Mitchell's appraisal, which used a comparable sales approach (but did not rely on the $65 basic rate) and yielded an even slightly higher valuation than that determined by Davis, as independent corroboration of Davis's method.

### E. Comparison of Basic Rate to Valuation Figure Reached by Taxpayer's Expert

Finally, the taxpayer contends that the trial court committed an "egregious error" when it compared the basic rate of $65 to the $67 figure arrived at by Saad representing the ultimate value of the property per square foot of FAR. The taxpayer is correct in noting the mistaken comparison by the trial court. However, in the context with which the court made the comparison, we do not believe that it contributed in any significant way to the court's acceptance of Davis's methodology or its overall valuation of the property. The court stressed that the taxpayer had failed to show any flaw with the $65 basic rate, noting only "incidentally" that the figure "was only $2.00 less than Ms. Saad's rate of $67.00 calculated on behalf of

the Petitioner." The court listed the parties' respective valuations at another point in its decision and made quite clear the rather wide discrepancy between them. There is no indication that the court justified its general acceptance of Davis's assessment on the ground, obviously incorrect, that it was close to the taxpayer's own appraisal.

Based on the foregoing considerations, the judgment of the trial court is hereby

*Affirmed.*

SCHWELB, Associate Judge, dissenting:

My colleagues in the majority affirm the trial judge's decision, which for the most part sustains the valuation of the subject property by the Department of Finance and Revenue (DFR), even though

1. on January 1, 1988, the date on which the assessor, Troy Davis, assessed the value of the property for the year 1989 at $38,760,980, Davis was unaware of the fact that the property had been sold at arm's length, less than thirteen months earlier, for $22,000,000;

2. the trial judge excluded evidence showing that in an assessment of the property conducted for the second half of the year 1988, dated December 31, 1987, the very same assessor had valued the property at $23,731,600; and

3. the judge accepted DFR's valuation over that proposed by the taxpayer's expert, Michelle Saad, who, unlike Mr. Davis, did take into consideration both the 1986 sales price and the December 31, 1987 valuation.

In my opinion, the deference that courts ordinarily accord to agency expertise is sorely tested by this record. Indeed, I am persuaded that the rather dramatic omissions and inconsistencies on the part of the DFR have so impaired the reliability of the agency's valuation that the process must begin anew. Accordingly, I would reverse the judgment.

1. *Cf. 1827 M St., Inc. v. District of Columbia,* 537 A.2d 1078, 1083 (D.C.1988) ("The filing of the application [for historic designation] puts the Mayor and all his subordinates, including the tax

## I.

## THE DECEMBER 1986 SALE

A. *The assessor's error.*

On December 12, 1986, the taxpayer purchased the subject property from Woodward & Lothrop for $22,000,000. The taxpayer presented testimony showing that the sale was at arm's length, and there is no evidence to the contrary. Although, as the trial judge found, the sale was duly recorded, the assessor was unaware of the transaction when he made the 1989 assessment less than thirteen months after the sale. The taxpayer contends that Mr. Davis' failure to ascertain and incorporate into his calculus a critical fact about the property that he was supposed to be assessing deprived his valuation of all or most of its probative force. I find it difficult to disagree.

It is surely beyond dispute that the assessor was obliged by law to become aware of, and to consider, a recent arm's length sale. Our real property assessment statute provides that the Mayor (and therefore his agent, the assessor) "shall take into account any factor which might have a bearing on the market value of the real property ...." D.C.Code § 47–820(a) (1997). An applicable regulation tracks the statute. 9 DCMR § 307.1 (1996). "Sales which represent arm's length transactions between buyer and seller shall be used in analyzing market values." *Id.* § 307.3(a). Moreover, the Recorder of Deeds is required by regulation to transmit the deed recordation tax return to DFR within five days, 9 DCMR § 312.1, and DFR thus receives notice of a duly recorded sale.[1]

The "estimated market value" of assessed property is defined in D.C.Code § 47–802(4) (1997) and quoted by my colleagues. "[F]air market value is the price property will bring when offered for sale by a seller who desires but is not obliged to sell and bought by a buyer under no necessity of purchasing." *Board of Supervisors of Fairfax County v. Donatelli & Klein, Inc.,* 228 Va. 620, 325 S.E.2d 342, 345 (Va.1985) (citations omitted).

assessor, on notice of its contents. Consequently, the assessor must take into account the effect that such an application, if granted, may have on the estimated market value of the property.").

As a matter of simple common sense, a recent arm's length sale must be a very significant factor, if not the most significant factor, in determining fair market value. The authorities are uniformly to the same effect.

Rule 1–5 of the Uniform Standards of Professional Appraisal Practice (USPAP) (1992) provides in pertinent part:

> In developing a real property appraisal, an appraiser *must:*
>
> . . . .
>
> (b) consider and analyze any prior sales of the property being appraised that occurred within the following time periods:
>
> (i) one year for one-to-four family residential property; and
>
> (ii) *three years for all other [including commercial] property types;*
>
> . . . .
>
> *Comment: Departure from binding requirements (a) through (c) is not permitted.*

(Emphasis added.) In failing to ascertain that the property had recently been sold, and in failing to include the sales price in his valuation calculus, the assessor thus departed from a fundamental precept of appraisal practice.[2]

The significance of a recent arm's length sale has also been recognized by the courts. "As is said in 84 C.J.S. Taxation § 576–c, pp. 1147, 1148, 'evidence of the purchase price of the assessed property, while not conclusive, is to be accorded substantial weight on the issue of fair market value.'" *American Viscose Corp. v. City of Roanoke,* 205 Va. 192, 135 S.E.2d 795, 798 (Va.1964); *accord, Arlington County Bd. v. Ginsberg,* 228 Va. 633, 325 S.E.2d 348, 352 (Va.1985) ("[w]here there has been a recent sale of property, of course, such sale should be considered"); *Donatelli & Klein, supra,* 325 S.E.2d at 345; *Belk Dep't Stores v. Taylor,* 259 S.C. 174, 191 S.E.2d 144, 146 (S.C.1972) ("[w]hile other circumstances may affect the question, the cost of an article is ordinarily some evidence of its value for tax purposes"); *People ex rel. 83rd East End Corp. v. Miller,* 265 A.D. 14, 37 N.Y.S.2d 677, 678 (N.Y.App.Div. 1st Dep't 1942) (per curiam). As the court stated in *United States v. 428.02 Acres of Land, Etc.,* 687 F.2d 266, 271 (8th Cir.1982), "a recent sale of the very property to be condemned, provided that the sale is an unforced, arm's-length transaction, is extremely probative evidence of fair market value." *See also* W.R. Habeeb, Annotation, *Admissibility, in Eminent Domain Proceeding, of Evidence as to Price Paid for Condemned Real Property on Sale Prior to the Proceeding,* 55 A.L.R.2d 791 (1957).[3]

#### B. The relevance of the assessor's error.

My colleagues in the majority do not contest the taxpayer's assertion that the assessor erred in failing to learn of and consider the 1986 sale of the property. Rather, they take the position, as did the trial judge, that the assessor's omission is irrelevant to the result. They base this theory on the fact that, although the sale was effected on December 13, 1986, the purchase price was established on November 13, 1983 in an op-

---

**2.** The trial judge stated in his order that "it may be unsound appraisal practice not to consider the sale of the subject property." Nevertheless, the judge gave "little or no weight" to Rule 1–5 because the taxpayer introduced into evidence the 1992 edition of USPAP, while the years in question were 1988 and 1989. The judge also opined that "these standards were established with regard to appraisers and not assessors."

I respectfully disagree with the judge's reasoning. There is no evidence that the 1992 standards were different in this respect from the standards previously in effect; indeed, the pre-1992 authorities are consistent with the 1992 edition of USPAP. In presenting to the court the most recent edition of the standards, the taxpayer's counsel simply followed the conventional practice of citing the current edition of publications such as, *e.g.,* the District of Columbia Code. Absent some showing that there had been a recent material change in the standards, the judge's refusal to consider the USPAP was, in my opinion, unwarranted.

I am also unable to agree with the trial judge's differentiation between appraisers and assessors. Factors relevant to the fair market value of the property are necessarily the same, whether that value is being estimated by an appraiser or by an assessor.

**3.** Condemnation proceedings, like tax assessment cases, turn on the estimated fair market value of the property in question.

tion agreement between Woodward & Lothrop and the taxpayer. Ryland Mitchell, an appraiser who testified as an expert on behalf of the District, stated that he attached little significance to the sales price because of the lapse of time since the end of 1983.

I do not deny—no reasonable person could—that the date of the option agreement is a relevant factor and may tend in some measure to alleviate the consequences of Davis' omission. In my opinion, however, the trial judge went too far, and so do my colleagues, in altogether disregarding the assessor's error. The price of land tends to appreciate, and one cannot reasonably suppose that, in 1983, the sophisticated seller and buyer were blind to the possibility that the value of the property might increase during the option period, or that they failed to take that prospect into consideration in negotiating the option price. In fact, there was testimony that, at the time of the option agreement, the parties did not intend to close for at least two years, that they never contemplated that the taxpayer would pay $22,-000,000 in 1983, and that the price was designed for a future date.

In any event, at the time that the assessor made the 1989 assessment, he did not know anything either about the 1986 purchase price or about the 1983 option agreement on which that price was based. If Mr. Davis had known the facts which it was his duty to know, he could have inquired into the circumstances, and he would then have been in a position to make an objective determination as to the appropriate weight to be accorded to a December 1986 sale pursuant to a November 1983 option under the circumstances of this case.[4] The record as it stands, on the other hand, presents us instead with a self-serving "after-the-fact" declaration that the DFR's valuation for 1989 was correct not-

withstanding the assessor's embarrassing error.

Moreover, there is compelling independent evidence that the December 1986 purchase price was not out of line with the market value of the property. In December 1987, a year after the sale, DFR found the fair market value of the property, for purposes of its assessment for the second half of 1988, to be $23,731,600. The assessor who made this valuation was Troy Davis. If Mr. Davis had been aware of the 1986 sale, and if he had known that the purchase price was only slightly lower than his own estimate of the value of the property a year later, he might well have accorded the purchase price some significance. At the very least, it would have been logical for him to do so.

Finally, even if—and it is a very big if—the four years that elapsed between November 1983 and January 1, 1988 supported the trial judge's view that the assessor's error in failing to consider the sale did not affect his valuation, that error would still be significant. In determining the fair market value of the property, the judge was faced with conflicting estimates by the expert witnesses for the District and for the taxpayer. The failure of Mr. Davis to learn of, and to consider, a critically important fact about the property that he was assessing has obvious relevance to the weight to be given to his testimony.

## II.

### THE TAX YEAR 1988 SECOND HALF ASSESSMENT

The taxpayer proffered at trial that on December 31, 1987, the property was assessed by Troy Davis at $23,731,600. When the taxpayer's attorney sought to question Mr. Davis on this subject, however, the evidence was excluded:

---

4. In fact, Mr. Davis admitted that, if he had known about the 1986 sale, he would have considered it in making his assessment. He testified that he would have "weigh[ed] the time frame in which the price was negotiated," that he would have "looked at the sale price in the context of the overall market surrounding the property," and that he "would have made a judgment based

on all the pertinent data involved." In response to a question in which he was asked to assume that the December 1986 sale was between a willing buyer and a willing seller, at arm's length, for $22,000,000, Mr. Davis stated that he would have considered that sale more important to the value of the property than the sales prices

Mr. Hahn:[5] Now isn't it true that you also did the second half assessment for tax year 1988?

Mr. Davis: That's correct.

Mr. Hahn: And will you tell the court what value you placed on the land for the second half?

Mr. Ferguson:[6] Objection, your Honor .... What was done for prior years, assessment years is irrelevant to the case here ....

Mr. Hahn: Your honor, the valuation date for the second half of [1988] is December 31, 1987, which is one day from January 1, 1988. So it's relevant to show the valuation one day apart in this piece of land.

....

[T]o have a difference of 63 percent in the value of this land between one year and the next where the valuation dates are only a day apart requires some explanation from the assessor ....

After the attorneys had argued the issue, the taxpayer's counsel asked Mr. Davis whether he agreed that the 1989 assessment represented a 63 percent increase over the prior year. Counsel for the District objected, and the judge sustained the objection:

> The Court: Now if you've got something more which, you know, you haven't introduced into evidence when it comes in maybe I'll be more receptive, but just to say because it's a dramatic jump and nothing else into evidence, [then] *that must mean that something's wrong, I can't buy that.* So I'm not going to let you get that in.

(Emphasis added.) The judge ruled, in other words, that the 1988 assessment was not admissible because that assessment did not conclusively prove that "something's wrong" with the 1989 assessment.

In my opinion, the judge applied an incorrect legal standard. Admissibility is not to be equated with conclusiveness. "[I]f the evidence offered conduces *in any reasonable degree* to establish the probability or improbability of the fact in controversy, it should go to the jury." *Home Ins. Co. v. Weide,* 78 U.S. (11 Wall.) 438, 440, 20 L.Ed. 197 (1870) (emphasis added); *see also Martin v. United States,* 606 A.2d 120, 128 (D.C.1991) (quoting *Weide* ). Professor McCormick has articulated the point effectively:

> It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common objection that the inference for which the fact is offered "does not necessarily follow" is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.

Edward W. Cleary, *et al.,* McCormick on Evidence § 185, at 542–43 (3d ed.1984); *see also Street v. United States,* 602 A.2d 141; 143 (D.C.1992) (Steadman, J.) (quoting Professor McCormick); *Martin, supra,* 606 A.2d at 128–29 (same).[7]

The 1988 assessment surely had *some* relevance to the issue before the court. By excluding that assessment from evidence, the judge deprived the taxpayer of the opportunity to impeach the assessor's valuation of the property for 1989 with a prior and potentially inconsistent assessment issued only one day earlier. It is possible that Davis could have satisfactorily explained the overnight 63 percent increase. It is also possible, however, that he could not.

---

of comparable properties which he did include in his calculus.

5. Gilbert Hahn, Esq., counsel for the taxpayer.

6. Joseph F. Ferguson, Esq., Assistant Corporation Counsel, who was representing the District of Columbia.

7. According to the majority, "the taxpayer has not come forward with any evidence to suggest why the 1988, second half, assessment should be

deserving of greater weight than the tax year 1989 assessment, whose [sic] methodology the trial court chiefly accepted ." In my opinion, the admissibility of the 1988 assessment cannot turn on whether that assessment deserves "greater weight." The evidence was admissible because it made it more likely that Davis was wrong and the taxpayer's expert was right.

Moreover, as we have noted, the evidence in this case required the trial judge to make a determination as to whether it was the District's witnesses or Ms. Saad who had presented the more persuasive valuation.[8] If, as the proffered evidence suggests, Troy Davis' assessment was inconsistent to a dramatic degree with his own valuation of the same property only a day before, the taxpayer was entitled to confront Davis with the prior valuation and to ask the judge to draw an appropriate inference if Davis could not satisfactorily explain the apparent inconsistency. The trial judge erred in precluding such impeachment.[9]

### III.

### CONCLUSION

I recognize that this appeal turns in substantial part on the trial judge's factual findings. The judge was present when the witnesses testified, while this court is limited to a paper transcript. Our review is therefore deferential, and we cannot second-guess the judge's determinations of fact. The judge is entitled, for example, to credit Mr. Davis over Ms. Saad, even if the former has been inconsistent and significantly impeached. This is particularly true where, as here, Mr. Davis' valuation was substantially corroborated by Ryland Mitchell, the District's appraisal expert.

But "[f]indings of fact which result from a misapprehension as to the applicable law . . . lose the insulation of the 'clearly erroneous' rule." *In re Application of L.L.*, 653 A.2d 873, 880 (D.C.1995) (citing *Murphy v. McCloud*, 650 A.2d 202, 210 (D.C.1994)). In

my opinion, the trial judge's critical findings in this case were predicated upon, and induced by, incorrect legal standards. Specifically, I believe that the judge failed to apply legal principles set forth in our statute and regulations, in judicial decisions from other jurisdictions, and (indirectly) in accepted appraisal standards, all of which required him to give substantially greater consideration than he did to the assessor's failure to incorporate the 1986 purchase price into his calculus.[10] The judge also erred, in my opinion, in excluding from evidence the December 31, 1987 assessment for the second half of the year 1988, and in precluding counsel for the taxpayer from cross-examining Davis on the apparent inconsistency between his two valuations issued one day apart. If the judge had recognized what I believe to be the significance of the December 1986 sale and the December 1987 assessment, especially when those two factors are considered in combination, and if the evidence had been developed accordingly, the judge's ultimate decision might well have been significantly different.

At bottom, my differences with the majority may be based in substantial part on our respective perceptions as to how far courts must go in deferring to supposed agency expertise. In the present case, the assessor's failure to consider, or even to learn of, the 1986 sale, together with the 63 percent increase in valuation from December 31, 1987 to January 1, 1988, would surely undermine the confidence of many, if not most, reasonable people in DFR's judgment. Agencies are supposed to act rationally and consistently. A taxpayer's obligation to the revenue man should not be based on a bureaucrat's ca-

---

**8.** Of course, the judge was not bound by the opinions of any of the witnesses. He could properly conclude, for example, that the true value of the property lay somewhere between Davis' assessment and Ms. Saad's estimate.

**9.** In the next-to-last paragraph of Part II.B of the opinion of the court, the majority says that the taxpayer has not "come forward with evidence" about the 1988 assessment. My colleagues also rely on representations which have been made to this court in regard to that assessment. In my opinion, it is unfair to fault the taxpayer for the lack of evidence, and to consider the District's representations to this court, when the taxpayer

was prevented by the trial judge from developing a factual record.

The majority also cites *Wolf v. District of Columbia*, 609 A.2d 672, 675 n. 2 (D.C.1992) and *Wolf v. District of Columbia*, 611 A.2d 44, 51 (D.C.1992) in support of the trial judge's exclusion of the 1988 assessment. Neither of the *Wolf* decisions is in point. In each, the court held that an assessment is not rendered erroneous simply by the fact that it substantially exceeds the previous year's assessment. Neither decision addresses the question whether a prior year's lower assessment by the same assessor is *admissible*.

**10.** In this connection, see also note 2, *supra*.

price. In my opinion, the present record has a certain Alice-in-Wonderland quality and cries out for more rigorous judicial scrutiny of the agency's actions, and of the trial judge's countenancing of those actions, than my colleagues believe to be necessary.

Justice should not only be done, but should seem to be done. I would therefore reverse the judgment, remand the case, and direct the trial judge to require DFR to begin all over again. Because my colleagues view the case differently, I respectfully dissent.